Filed 3/13/14  S.C. v. Super. Ct. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| S.C., | |
| Petitioner, | G049412 |
| v. | (Super. Ct. No. DP023123) |
| THE SUPERIOR COURT OF ORANGE COUNTY, | O P I N I O N |
| Respondent; | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY et al., | |
| Real Parties in Interest. | |

Original proceedings; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, Dennis J. Keough, Judge.  Petition denied.

Frank Ospino, Public Defender, Dave Dziejowski, Assistant Public Defender, and Dennis M. Nolan, Deputy Public Defender, for Petitioner.

No appearance for Respondent.

Nicholas S. Chrisos, County Counsel, and Karen L. Christensen, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

Law Office of Harold LaFlamme and Jess Ann Hite for Real Party in Interest L.C.

\* \* \*

## INTRODUCTION

S.C. (Mother) is the mother of L.C., who was taken into protective custody at the age of 11 in October 2012. By petition for writ of mandate, Mother challenges the juvenile court's order terminating reunification services and setting a permanency planning hearing under Welfare and Institutions Code section 366.26 (further code references are to the Welfare and Institutions Code unless otherwise indicated). The section 366.26 hearing is set for April 9, 2014.

The Orange County Social Services Agency (SSA) has filed opposition to Mother's writ petition. Counsel for L.C. also opposes Mother's writ petition and has joined in the arguments made by SSA.

Mother argues substantial evidence did not support the juvenile court's finding that she was offered reasonable reunification services. Specifically, she argues SSA made no effort to implement conjoint therapy with L.C., as required by Mother's case plan. We conclude substantial evidence supported the juvenile court's finding that Mother was offered reasonable reunification services and therefore deny her writ petition.

## FACTS AND PROCEDURAL HISTORY

We limit our recitation of the facts and procedural history to what is necessary to resolve the issue whether Mother was offered reasonable reunification services.

2

# I.

## Detention and Jurisdictional Hearing

L.C. was taken into protective custody in October 2012, pursuant to a protective warrant based on allegations of physical abuse and neglect. The detention report stated: "The child, L[.C.], is afraid of [M]other 'every day' and she often goes to sleep 'with tears in my eyes[.']  The child is afraid [M]other will yell at her or hurt her. She says, 'I don't know what she's capable of.'  Typical discipline is [M]other hitting her on the top of her head with an open or closed hand, always two times in a row.  She says it hurts and she tries to block it with her hands.  She says [M]other also kicks her on her leg or her bottom, slaps her face, arm or stomach, and shoves her into a corner.  The child disclosed that [M]other sometimes leaves bruises on her from hitting her.  The last time she was hit was approximately one week ago, which resulted in a bruise on the back of her left upper arm.  L[.C.] says that [M]other gets very angry over little things, just as much as the bigger things, and that she never knows what is going to anger [M]other.  [¶] [M]other has been heard telling the child she is a retard, mental, dyslexic, unstable and stupid.  [M]other claims that she is home schooling the child, but [M]other does not have an education plan."  The detention report described Mother as having "an unresolved mental illness which has affected her ability to parent the child."

Mother told the social worker that L.C. is "disabled and special needs" but refused to disclose what that disability was.  Mother insisted L.C. had been mentally ill since the age of three but would not disclose the names of any physicians who had treated her.

The juvenile dependency petition alleged three counts:  (1) serious physical harm (§ 300, subd. (a)); (2) failure to protect (§ 300, subd. (b)); and (3) serious emotional damage (§ 300, subd. (c)).  On October 12, 2012, the juvenile court ordered L.C. detained and authorized six hours per week of monitored visits with Mother.

In February 2013, the juvenile court found the allegations of counts 2 and 3 of the petition (as amended by the court) true by a preponderance of the evidence, declared L.C. a dependent child, removed L.C. from Mother's care and vested custody with SSA, and ordered Mother to undergo an Evidence Code section 730 evaluation (the section 730 evaluation). The court ordered reunification services in accordance with SSA's December 3, 2012 case plan. That case plan required Mother and L.C. to participate in conjoint therapy with a therapist approved by SSA "to address the allegations in the petition and the reasons the child was taken into protective custody."

## II.

### Mother's Participation in Reunification Services

In an interim review report dated April 25, 2013, the assigned social worker commented she was unable to arrange a meeting in person with Mother, who would not provide any information about a time and place to meet. In a telephone conversation on March 7, 2013, the social worker told Mother, "in order to provide [you] with referrals for case plan services [I] need[] to know what location to send the referrals to." Mother would not provide information but said, "I could be in Hawaii or Nevada or some where [*sic*] else."

The April 25 report stated: "As of the writing of this report, the undersigned has not heard from [M]other as to the status of her medical situation or if [M]other has completed any services. The undersigned has not been able to meet with [M]other in person. The undersigned's only way of communicating with [M]other is through email or if [M]other calls the undersigned."

At a hearing on April 25, 2013, Mother declined to sign a referral for case plan services. The social worked sent the referral to Mother's attorney.

The SSA interim review report, dated May 29, 2013, stated Mother did not call in for her appointment for the section 730 evaluation, as was required by her case plan. The report stated, "[M]other has not completed any case plan services at this time."

4

At a hearing on May 29, 2013, the juvenile court ordered "a conjoint therapeutic setting where visitation is to take place."

The SSA interim review report, dated June 14, 2013, stated: "On June 4, 2013, the undersigned contacted the child's therapist, Jennifer Johnson, to inform the therapist about the court order for conjoint therapy. Ms. Johnson was going to communicate this to the child at their June 5, 2013 session. . . . The conjoint sessions are to begin on June 12, 2013. . . . [M]other might not be able to make the June 12, 2013 appointment. . . . [¶] On June 6, 2013, the undersigned emailed [M]other to inform her about the order for conjoint therapy. On June 7, 2013, [M]other responded to the undersigned's email. [M]other did not mention the conjoint counseling but did respond to the visitation. On June 10, 2013, the undersigned received an email from [M]other asking if the counseling could be on the weekend. The undersigned responded to [M]other. The clinic does not have weekend appointments. [M]other is not sure if she will be able to attend the counseling session on June 12, 2013."

The SSA status review report, dated August 19, 2013, concluded: "Mother's cooperation with the case plan and efforts and progress made toward alleviating or mitigating the causes necessitating court involvement have been: [¶] None." (Some capitalization omitted.) The report noted that Mother had not signed the case plan and refused to meet with the social worker to review the plan in person.

At the six-month review hearing on August 28, 2013, the juvenile court found that Mother had been provided reasonable services but had made no progress toward alleviating or mitigating the causes necessitating L.C.'s placement. The court found that SSA had complied with the case plan. The service plan adopted by the juvenile court at the August 28, 2013 six-month review hearing required Mother and L.C. to participate in conjoint therapy with a therapist approved by SSA. Therapy was to begin "[w]hen appropriate and with the input of the child's therapist."

Mother appealed from orders and findings made at the six-month review hearing. In *In re L.C.* (Mar. 11, 2014, G049150) (nonpub. opn.), we affirmed those orders and findings.

The SSA interim review report, dated October 25, 2013, stated: "On October 12, 2012, the Court ordered monitored visitation to be minimum of six hours weekly. Over the past year, [M]other has not cooperated with [SSA] to facilitate visitation. [M]other has had a total 5 visits. The undersigned believes the agency has gone to extraordinary efforts to provide visitation between [M]other and the child. The undersigned is limited to e-mailing [M]other and awaiting her response to set up visits. [M]other is unable to commit to a set date and time because her employment and medical conditions are prohibitive. [M]other has flatly refused to provide [SSA] with proof of employment or documentation of her medical condition. [¶] It was with the help of [M]other's attorney that the undersigned was able to complete a visitation referral as [M]other refused to sign the document. This was completed June 6, 2013, four months after being assigned the case." The report concluded: "[M]other has not made any attempts to complete her court ordered services and refuses to cooperate with [SSA]. At this time, the prognosis for reunification is poor."

During the reunification period, Mother claimed that medical conditions, for which she refused to provide documentation or proof, prevented her from visiting L.C. She accused the social worker of bias and of making defamatory statements. Mother continued to claim that L.C. was mentally ill and manipulating the social worker.

Mother was uncooperative with the psychiatrist assigned to conduct the section 730 evaluation and never met with him in person or by telephone. Mother insisted the evaluation be conducted by telephone because she had no transportation and could not miss work. Evening appointment times were offered, but Mother would not take them. The psychiatrist's office tried to schedule a telephone interview, but Mother said she was in the hospital and could not participate in the interview. Various dates and

6

times were offered, but Mother rejected them all. Mother ultimately told the psychiatrist not to contact her again. The psychiatrist reported the section 730 evaluation of Mother was never conducted "[d]ue to a lack of success encountered by my office in numerous attempts to schedule an evaluation."

On several occasions, L.C. informed the social worker that she would like to live with her maternal aunt and uncle in Chicago.

### III.

### Twelve-month Review Hearing

The 12-month review hearing was conducted on December 10, 2013. At the hearing, the court received in evidence the SSA status review report dated December 9, 2013 (the December 9 Report) and heard testimony from Mother.

A. *The December 9 Report*

The December 9 Report stated: "[M]other has not completed any of her case plan services during the current period of supervision. [M]other was to complete a 730 evaluation, enroll in parenting classes, individual counseling and attend conjoint counseling with the child. [M]other has not met with the undersigned for monthly meetings. [M]other had several reasons why she could not comply with case plan requirements. The undersigned does not know where [M]other is living as she was evicted from her last known address in Mission Viejo. [¶] [M]other mentions working in most of her e-mails, unfortunately [M]other has not shared this information with the undersigned. Each time the undersigned asks [M]other about anything personal . . . she states 'I don't have to give that information; I am in the witness protection program.' [M]other is not forthcoming when asked questions."

As for case plan compliance, the December 9 Report concluded: "[M]other has not been in compliance with her case plan. [M]other was required to enroll in a parenting education class, individual counseling and 730 evaluation. [M]other has not completed any case plan services. The undersigned sent in a referral for parenting

education and individual counseling . . . . The undersigned gave the service provider [M]other's e-mail address as that is the only way she can be contacted. [M]other did not respond to e-mails from the service provider. [¶] At this time, [SSA] cannot provide any information to prove [M]other is capable of parenting the child. [M]other has not complied with any medical or psychological treatment. [M]other has not shown that she accepts responsibility [for] her actions that brought the child to the attention of [SSA]. [M]other struggles to maintain a relationship with the child and has not been cooperative with setting up and maintaining visitation with the child. . . . [M]other believes the child is sick and treatment resistant." The social worker expressed her opinion that "[M]other is not serious about reunifying with the child as she has not made any attempt to complete her case plan requirements."

The December 9 Report explained that the social worker had provided Mother with information about free parenting classes in her area, but Mother did not respond. Mother had not been responsive to the social worker's request for monthly in-person meetings. Mother had made only five visits with L.C. since visitation began in June 2013 and was not cooperative in providing the social worker with visitation information or by confirming scheduled visitations.

According to the December 9 Report, L.C. did not want to reunify with Mother and wanted to live with L.C.'s maternal aunt and uncle in Chicago. SSA requested that the juvenile court grant authority for L.C. to be placed with the maternal aunt and uncle, who had completed a home study, and concluded they "will provide a safe and stable home for the child."

B. *Mother's Testimony*

Before Mother testified, her counsel made a motion under section 350, subdivision (c), arguing that SSA had failed to meet its burden of proving reasonable services had been offered. The juvenile court denied the motion. The court stated that Mother had placed preconditions on participation in services, claimed she was

8

unavailable with no supporting documentation, and engaged in "gaming the schedule [as to] her availability."

Mother's often rambling testimony included complaints against SSA, L.C.'s supposed mental health issues, Mother's own health issues, transportation difficulties, and theft of her cellular phones. Mother claimed the December 9 Report had "a multitude of false allegations" and "all of the allegations are based on family members." Mother testified she tried to participate in the section 730 evaluation, but "[t]hey couldn't get me an appointment, and they said they would do the report without seeing me. That's how doctors misdiagnose." Mother also claimed she had received no assistance from the social worker in participating in reunification services and claimed she had signed the service plan on two occasions. Mother testified she could not participate in reunification services because she lived in south Orange County, the only resources offered her were in north Orange County, she did not have a car, and "[t]aking the bus from south Orange County to north Orange County [is] a six-hour commute." Mother testified her various health problems stemming from an automobile accident prevented her from participating in reunification services. She testified she had informed the social worker she was available on nights and weekends to visit L.C. and for counseling, but "they work around [L.C.]'s schedule, and they would schedule it when they knew [L.C.] was going to church." Mother claimed she needed, but had not been offered, counseling appointments for nights and weekends.

On cross-examination, Mother refused to disclose where she lived because "[m]y address is confidential on record with the public defender. I'm a protected witness. I was subpoenaed by the State of Hawaii, so for safety reasons I don't even tell my parents where I'm living." Mother refused to disclose whether she lives in California. Mother testified she never provided her address to SSA, her cellular telephones had been stolen, and she would communicate only by e-mail "so that I could get it in writing."

9

Mother testified she worked as an independent contractor, she "worked different jobs," she was "flexible with her work," and her work schedule was "constantly changing"; however, Mother told the social worker she "needed evenings and weekends" to visit L.C. and for counseling. Mother testified L.C. needed medication for her mental illness, which had been diagnosed by "multiple doctors," and L.C. was "a danger to herself and others."

## C. *The Juvenile Court's Ruling*

The juvenile court found Mother not to be a credible witness and her testimony to have internal conflicts. The court stated: "She has indicated on numerous occasions the restrictions in terms of her visitation were at times when she could visit with the child and her availability for services, and yet this contrasts with the . . . alluded-to flexibility of her work schedule. [¶] The court would note specifically that [M]other will articulate a willingness to participate in services, hence the evidence regarding the 730 evaluation is instructive. Notwithstanding [M]other's assertion that she was willing to participate in the 730 evaluation, the court would find that there is evidence before the court . . .[,] which the court credits and believes[,] that [M]other was oppositional, did not wish to participate in that evaluation, and contrived a myriad of reasons for her failure to participate in the evaluation . . . . [¶] The court would note that [M]other's comments in this particular hearing seemed to be consistent with her approach to other services; that there is an articulated willingness to participate in services, but an underlying opposition to doing so. It's almost a passive aggressive type of behavior: Yes, I'll do it, but these are all impossible."

As to the need for the section 730 evaluation, the court commented: "[T]here seems to be a significant issue which the 730 would have been helpful in addressing. That 730 evaluation has not taken place, and the consequences to [M]other have been to further complicate her situation by not addressing what the court perceives [i]s a core issue of her own psychiatric or psychological condition."

10

The juvenile court ordered the termination of reunification services and set a permanency planning hearing under section 366.26 for April 9, 2014.  The court granted the request to place L.C. with her maternal aunt and uncle in Chicago.

## DISCUSSION

## I.

## Relevant Law and Standard of Review

Except under circumstances not applicable here, reasonable reunification services must be offered when a child is removed.  (§ 361.5; *Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1501.)  Whether the reunification services offered were reasonable and suitable is judged according to the circumstances of the particular case.  (*Earl L. v. Superior Court*, *supra*, at p. 1501.)  "'[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . .'  [Citation.]" (*Ibid.*)

We review the juvenile court's finding that reasonable services had been provided or offered under the substantial evidence standard.  (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598; *Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1010.)  "[I]n reviewing the reasonableness of the reunification services provided by [SSA], we must . . . recognize that in most cases more services might have been provided, and the services which are provided are often imperfect.  The standard is not whether the services provided were the best that might have been provided, but whether they were reasonable under the circumstances." (*Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969.)  In reviewing the reasonableness of services offered, we view the evidence in a light most favorable to the respondent and draw all reasonable inferences to

11

uphold the juvenile court's order.  (*In re Mary B.* (2013) 218 Cal.App.4th 1474, 1483; *Christopher D. v. Superior Court* (2012) 210 Cal.App.4th 60, 70.)

## II.

### Substantial Evidence Supported the Finding of Reasonable Services.

Substantial evidence supported the juvenile court's finding that Mother was offered reasonable reunification services.  During the period of supervision prior to the six-month review hearing, Mother was given the name, address, telephone number, and bus route information for L.C.'s therapist.  There is nothing in the record to indicate that contact information ever changed.  Mother was asked at the 12-month review hearing whether she was offered participation in conjoint therapy with L.C.  Mother replied, "[n]o" but then testified she had the name and telephone number of L.C.'s therapist.

Mother testified she wanted to participate in therapy with L.C. and claimed she tried to contact the therapist.  The juvenile court, which heard Mother testify, found that she would say she wanted to participate in reunification services, but would find excuses for not taking advantage of services offered her, and had an "underlying opposition to doing so."

Reunification services are voluntary and cannot be forced on an unwilling or indifferent parent.  (*In re Christina L.* (1992) 3 Cal.App.4th 404, 414; *In re Jonathan R.* (1989) 211 Cal.App.3d 1214, 1220.)  The record presented to us makes it abundantly clear that Mother was an unwilling parent and would not have participated in conjoint therapy whatever additional efforts SSA might have undertaken to facilitate it. Mother refused to participate in any reunification services whatsoever.  Mother refused to sign her case plan, refused to give anyone her address or telephone number, refused to meet with the social worker in person, refused to provide the social worker with employment information, and refused to return e-mails and telephone calls from service providers.  Mother did not return telephone calls from the service provider authorized to

12

provide Mother individual counseling, resulting in the termination of the referral. Mother never scheduled an appointment with the psychiatrist for the section 730 evaluation. Mother had made only five visits with L.C. since visitation began in June 2013. Any reasonable effort by SSA to assist Mother in participating in conjoint therapy would not have overcome her "underlying opposition" to reunification services.

### DISPOSITION

The petition for writ of mandate is denied.


FYBEL, J.

WE CONCUR:


ARONSON, ACTING P. J.


IKOLA, J.

13