Filed 5/20/15  J.C. v. Super. Ct. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| J.C.,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF MARIN COUNTY,<br><br>    Respondent;<br><br>MARIN COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES et al.,<br><br>    Real Parties in Interest. | A143218<br><br>(Marin County Super. Ct. Nos. JV25769A, JV25770A) |

Six-month-old twins (now almost age 3) were removed from the care of their mother, J.C. (Mother), pursuant to Welfare and Institutions Code section 300, subdivision (b).[1]  Mother purports to appeal from an order terminating reunification services and setting a section 366.26 hearing to consider termination of her parental rights.  She argues the trial court erred in finding it would be detrimental to return the twins to her care, and further erred in finding the Marin County Department of Health and Human Services (Department) offered or provided her with reasonable services, as the Department allegedly failed to identify and address her mental health issues among other concerns.  We construe Mother's appeal as a writ petition, conclude the trial court's findings were supported by substantial evidence, and deny the petition.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

# I.    BACKGROUND

From 2009 to 2011, Mother was involved in an earlier dependency case involving the twins' older half-siblings, triplets who were born in 2002. The triplets came to the Department's attention due to Mother's substance abuse, which contributed to neglect of the minors. The triplets were removed from Mother's care in March 2009 after she physically abused one of them. Mother received services from January 2009 to November 2011. The triplets' father was incarcerated with an immigration hold and later deported.

In March 2009, Mother reported the following substance abuse history. She started using alcohol and marijuana (sometimes laced with cocaine) at age 13. When she was 16, she experimented with ecstasy and mushrooms, tested positive for controlled substances while on probation for auto theft, and completed a six-month outpatient treatment program. At age 18, she completed 30 days of inpatient treatment and three or four months of aftercare, and the following year she completed 28 days of inpatient treatment and six months in a halfway house. Mother remained clean and sober for about a year and a half. In 2001 (at age 20), however, she met the triplets' father and resumed using alcohol and cocaine. She stopped using these substances when she learned she was pregnant, and she moved into a shelter and attended a day treatment program. She remained clean and sober from 2002–2007. From December 2008 to March 2009, she relapsed, occasionally using cocaine and methamphetamine.

Following the triplets' removal in March 2009, Mother completed a one-year inpatient substance abuse treatment program. The triplets were returned to her care in about March 2010. In November and December 2010, Mother was believed to be using alcohol, marijuana and methamphetamine; she expressed paranoid and delusional thoughts, and displayed erratic sleeping patterns. She agreed to the children's temporary placement with their maternal grandparents while she entered a detoxification program. Thereafter she successfully completed an intensive outpatient treatment program.

In March 2009, Mother also reported the following mental health history. She was diagnosed with depression and prescribed Prozac and Halidol at about age 13. She

stopped taking those medications because of side effects. When she was about 20 to 22 years old (2001–2003), she started taking Paxil off and on. From 2003 to 2005, she did not take any medications. After she suffered domestic violence in 2006, " '[e]verything went downhill." She was diagnosed with post traumatic stress disorder by a CalWorks therapist in 2006 and with bipolar disorder by a Marin Community Clinic doctor in 2007. The latter prescribed Effexor, Klonopin, and then Wellbutrin. In 2008 to 2009, she suffered from anxiety attacks and "could not go out of her home because she thought people were talking about her." In September 2011, Mother went to the hospital claiming that bugs were crawling out of her.

In October 2012, Mother gave birth to the twins. The twins' father, R.A. (Father), had a history of severe substance abuse and a criminal history dating back to 2003 that included convictions for threats, burglary, vehicle theft, domestic violence, and resisting arrest. In 2013, Father entered an inpatient treatment program in lieu of jail through the "Support and Treatment After Release Court" for defendants with serious mental illnesses. However, he abandoned the program in April 2013 to go live with Mother. He reportedly used the family home as a crack house, which caused the family to face eviction.

On April 21, 2013, Father punched Mother in the face six to 10 times and later the same day hit her twice in the back of the head. The violence occurred in the vicinity of the family home while the twins and at least two of the triplets were home. On April 26, the Department filed a juvenile dependency petition on behalf of the twins pursuant to section 300, subdivision (b). As later amended, the petition alleged that the twins were at risk of suffering serious physical harm or illness because, among other reasons, Mother was unable to protect them from being repeatedly exposed to severe domestic violence at the hands of Father and she remained in contact with Father. The twins were detained and placed in foster care.

Following removal of the children, Mother moved to a shelter but was asked to leave for noncompliance with shelter rules. She spent two weeks in May 2013 with Father in a homeless encampment where she admitted using methamphetamine. There

3

were numerous signs throughout that month that Mother's mental health had seriously deteriorated. She told a social worker she could see " 'huge ticks' crawling out of her" and reported that Father had cut into her skin "to get the bugs out," but cut too deeply and she needed medical care. She told her mother that "if she dies of an overdose, 'don't believe them because they are after me and trying to kill me.' " She reported that a cousin of the triplets' father "was the one responsible for the Ohio kidnapping in which three women were being held captive in a basement" and that the triplets' father "was always trying to get her and the children to move to Ohio. . . . 'I feel scared. They move people from state to state and it is some dirty shit and I don't know how to get away.' " Upon her later return to the shelter, Mother "spray[ed] bug repellent everywhere and [would not] open any windows." When Father tried to break the windows of Mother's car while she was driving downtown, Mother said she was scared because "[Father] and his family are everywhere" and the police would not arrest Father for domestic violence because they were using him to gather information. She also maintained that Father could either see the Department's or other service providers' offices from where he lived, or that he had friends working there, so she was nervous about going to those places. On May 29, Mother tested clean but her psychiatric nurse practitioner (nurse) at a community health clinic reported that Mother nevertheless "look[ed] psychotic, manic and paranoid." The nurse was not surprised because Mother "stays symptomatic for weeks after she uses methamphetamine." Mother declined to enter a detoxification center, and the nurse did not refill Mother's prescription of Adderall because Mother was agitated.

In the June 2013 jurisdiction and disposition report, the Department reported that Mother "currently does not feel that she needs any substance abuse recovery treatment. She believes that she will be fine if she gets [Father] out of her life. [She] feels that she is primarily addicted to the unhealthy relationship with [Father] and that she used drugs as a result." The social worker wrote: "In the past, [Mother's] mental health symptoms have been kept stable with Adderall and Effexor, if she remains clean and sober. [¶] When [she] uses methamphetamine, specifically, she becomes highly paranoid, has delusions, and has a difficult time believing that people are trying to help her. Her mind seems to

4

race, as it becomes difficult to have a linear conversation with her. These symptoms make [her] difficult to work with, but [the nurse] has stated that antipsychotic medications have not been found to be effective when [Mother] is in this state."

On June 17, 2013, Mother entered an inpatient treatment program. The twins could be placed with her in the program by mid-August if she complied with its rules. While Mother was in this treatment program, the nurse continued to see her regularly, assess her needs, and distribute her medications.

At a July 18, 2013 jurisdiction and disposition hearing, the court sustained the petition as amended, formally removed the twins from Mother's care, ordered reunification services, and set a six-month hearing for December 9, 2013, and a 12-month hearing for June 2014. The service objectives of Mother's case plan were for Mother to stay free from illegal drugs, comply with medical or psychological treatment, appropriately parent her children, and shield her children from domestic violence. The specific requirements of the case plan, which was drafted before Mother entered the treatment program, required Mother to participate in a weekly domestic violence support group at her shelter, stay in the shelter until she could relocate, obtain a new phone number, keep her phone number and address confidential from Father, apply for "Victim/Witness" funds for therapeutic services for her and her children, "participate in individual counseling in order to address the issues that cause her to engage in unhealthy relationships" as well as "her mental health symptoms and recovery issues," work with a parenting advocate on time management, household organization, and age-appropriate discipline, participate in a drug and alcohol assessment and follow the assessor's recommendations, participate in random drug testing, and identify a sponsor and attend three 12-step meetings a week.

In August 2013, the twins were placed with Mother at the residential treatment program. On September 30, Mother argued with two other residents and slammed a door on the finger of a staff member who was trying to intervene. As a result, Mother was discharged from the program. A social worker arrived to take the twins into protective custody, and Mother "was highly agitated and . . . pounding on the windows while

5

shouting the names of her children, upsetting [the twins] . . . . [Mother] agreed to stay calm and hug her children before they were removed from her care. Instead, [she] clutched [one of the twins] and began sobbing uncontrollably and shouting over and over again, 'Don't take my baby!' " Mother climbed into the car that was going to take the twins away, refused to leave for five minutes, and then clung to the door and placed her foot under the tire to try to prevent their departure. Mother later said that a change in her medication might have contributed to the incident. She had been hearing people walk outside the window at night and seeing footprints in the leaves, but no one would believe her. She also said the twins' removal was for the best because the program was too chaotic and the environment was too restrictive for children. She did not want to return to inpatient treatment and felt drug treatment classes through the local hospital were sufficient for her.

On October 3, 2013, a supplemental petition was filed on behalf of the twins pursuant to section 387. They were detained and placed in their former foster home. At the detention hearing, the court ordered the Department to provide Mother with substance abuse testing and treatment, mental health services, parenting education and domestic violence services. The court sustained the supplemental petition on November 13 and removed the twins from Mother's care. A revised case plan required Mother to "meet with [the nurse] on a regular basis in order to monitor the treatment of her mental health issues. [Mother] will use her psychotropic medications as prescribed and will not share them with anyone else. [She] will contact her medical provider immediately if she is feeling angry and out of control. [¶] [She] will work with a therapist to identify the issues that keep her from leading a clean and sober life." Other aspects of the plan remained the same. A six-month hearing was set for May 2014, with an interim review hearing set for February 2014.

In mid-October 2013, Mother started living with Father in a van after Father was kicked out of a residential treatment program for testing positive for drugs. Later that month, Mother showed up for a visit with a bruise on her face. On November 5, Father was arrested and the van was impounded. About 10 days later, Mother admitted she

6

would test positive for methamphetamine, and she entered a second residential treatment program. On December 16, Father was found hiding in the closet of Mother's room in the program and it appeared had been hiding there for about five days. Mother was asked to leave the program. Mother and Father apparently lived together on the streets until January 3, 2014, when Father was arrested for assault with a deadly weapon. On the same day, Mother went to her parents' home and caused a disruption. Police responded and served Mother with a restraining order that her parents had obtained due to prior angry and demanding phone calls. Mother was placed on a psychiatric hold. Upon her release, she forced her way into her parents' home and was arrested. While in jail, she showed a social worker bruises all over her back side that she said were inflicted by Father and said she was afraid Father would kill her.

During a meeting with a parent advocate on January 28, 2014, Mother made paranoid statements about the social worker's alleged bias against her. Because the statements seemed excessively paranoid, the parent advocate took Mother to a hospital emergency psychiatric unit, where Mother met with the nurse. Mother "shout[ed] that she was going to hunt [the social worker's] children down and get them addicted to drugs by giving them methamphetamine, purportedly because she wanted [social worker] to see what it would be like to have addicted children." Mother also threatened to take a gun to the town where the social worker lived and said, "[I]f I can't have my kids, she can't have hers." When Mother realized the nurse was going to place her on a psychiatric hold, she ran out of the hospital and was chased and restrained by police. The social worker obtained a restraining order against Mother, and a new social worker was assigned to her case. The Department also suspended Mother's parent advocate services out of concern that Mother posed a risk of harm to the parent advocate as well.

In February 2014, Mother apparently was homeless and living on the streets. She had been kicked out of a shelter for not complying with the rules. When she met with the new social worker on February 4, she was dirty and wearing nothing but a shirt and a blanket draped around her lower body. She appeared to be under the influence of drugs. She had missed three scheduled drug tests in January and February, and she had left a

methamphetamine pipe at her parents' house in January. The social worker helped Mother enter a five-day detoxification program. At the February 2014 interim review hearing, the court continued services.

From March to June 2014, Mother continued to call, text and email her parents' home (leaving as many as 20 messages a day) despite the restraining order, enrollment in the treatment program, and court admonitions. Mother left messages like, "You fucking crazy menopaused old ass dumb bitch. Thanks for stealing my kids." By May, the twins had been moved from foster care to live full time with Mother's relatives, who planned to adopt and raise them with the triplets. On May 30, the juvenile court terminated Mother's parental rights to the triplets.

On May 16, 2014, Mother filed a section 388 petition seeking placement of the twins with her in another residential treatment program—the third since the beginning of the twins' dependency case. She had been admitted to the program on March 20 and was committed to participating for 12 months. The program utilized "Trauma Informed Care," which focused on the connection between traumatic life experiences and addictive disorders. Mother found the program to provide a more calm and caring environment than the program she had attended in the summer of 2013. She was participating in therapy, parenting classes, other social skills classes, and a domestic violence support group. She had obtained a 10-year restraining order against Father, and she was visiting the twins regularly. The court granted a hearing on the petition.

In its June 2014 status review report, the Department wrote that Mother reportedly was doing well in her treatment program. In March, the social worker had recommended that Mother's case manager in the treatment program arrange for a psychiatric evaluation and medication assessment of Mother. On March 17, March 31, April 23, and April 30, the social worker followed up and learned Mother was not taking medication and did not want to do so. She was participating in individual therapy. Two months later, the social worker wrote in an addendum report that she had recently received progress notes of an evaluation of Mother, which stated that she denied any history of violence to herself or others and she "declined medication." The nurse was no longer seeing Mother because

Mother "fired" her after the January 29 incident, but the nurse opined generally that Mother did well when she was calm and taking her medications, but had difficulty with impulse and temper control and particular difficulty when she used methamphetamine. Mother never followed up with the practitioner who was assigned to her case in place of the nurse.

The Department recommended termination of services. A contested hearing was set for June 25, 2014, and continued to August 1. In an addendum report, the Department wrote that Mother appeared to be doing very well in her treatment program and that she regularly visited with the twins. The Department continued to recommend termination of services because "given [Mother's] history, she would have to demonstrate she is able to sustain a drug and violence free lifestyle with stable mental health for a significant amount of time before the children could be returned to her care. However, [the twins] should not have to wait any longer for their own safety and stability. They are [22] months old now and were just six months old when they were first detained . . . . They have been in the care of [Mother's relatives] for four months now. They deserve to continue to have consistency and stability in their lives."

At the contested hearing, which took place on August 1, August 27, September 5, and September 24, 2014, the social worker testified that Mother's progress in her treatment program was still incomplete: "She only recently started going out in the community by herself and is working on getting employment . . . . She needs to complete the program and be strong in her own sobriety before she can take on the responsibility of two children. . . . [¶] . . . [¶] [T]he Department would like to see a longer period of stability and sobriety before . . . return[ing] the children." The social worker opined there was not a substantial probability that the twins could be returned to Mother's care in six months if additional services were provided.

On the issue of mental health services, the social worker testified that the Department did not order a psychological evaluation early in the case because the nurse had said Mother was doing well on her medications. Later in the case, the social worker recommended that Mother's treatment program arrange for a psychological evaluation,

9

but the program declined because Mother did not want to take psychotropic medication. Although Mother was feeling good and performing well without medication while in the structured treatment program, the social worker was concerned about how Mother would do without medication after she left the program. Regarding the recent psychological evaluation, the evidence at the hearing was not entirely clear. The social worker testified that Mother was prescribed antidepressants as a result of the evaluation. Mother's therapist at the treatment program testified that the psychiatrist diagnosed Mother with adjustment disorder with depressed mood and recommended continued psychotherapy but did not prescribe medication. Mother testified that she went to at least two places for a mental health assessment and was diagnosed with depression. On July 28, a doctor at a "crisis" clinic recommended she supplement her psychotherapy with antidepressant medication. She had started taking antidepressants and was participating in therapy. The therapist confirmed that Mother participated in therapy in the treatment program.

The social worker testified that Mother never completed domestic violence classes as required by her November 2013 revised case plan. Although Mother had completed a domestic violence class in her treatment program, the Department concluded the class did not meet its requirements. The program agreed to release Mother to participate in more intensive training that was paid for by the Department, but the social worker had not had time to arrange it.

Mother testified that after she was discharged from the first treatment program in September 2013, the social worker did not help her find housing or a new treatment program, and in January 2014 the social worker told Mother she hoped the twins would be adopted. Mother obtained services through a shelter and apparently found the last inpatient treatment program on her own.

The court found that return of the twins to Mother's care would be detrimental and that reasonable services had been provided to Mother. The court denied Mother's section 388 petition, terminated services, and scheduled a section 366.26 hearing for January 2015. Mother's counsel has informed us that the hearing has since been continued to June 4, 2015.

10

Mother filed a notice of intent to file a writ petition challenging the court's orders and also filed a notice of appeal from the court's denial of her section 388 petition. She never filed a writ petition.

## II.    DISCUSSION

A.    *Mother's Appeal is Construed as a Writ Petition*

Orders setting a section 366.26 hearing ordinarily must be challenged by writ petition. (§ 366.26, subd. (*l*)(1).) The same rule applies to all " 'issues arising out of the contemporaneous findings and orders made by a juvenile court in setting a section 366.26 hearing.' [Citation.] This includes issues based upon the denial of a parent's section 388 petition where a reversal of such denial would require vacation or reversal of the setting order itself." (*In re Anthony B.* (1999) 72 Cal.App.4th 1017, 1022.) However, an exception applies when the juvenile court fails to advise the appealing parent of the writ requirement. In such cases, the parent is usually excused from the writ requirement and may challenge the order and related rulings by way of a notice of appeal. (*In re Athena P.* (2002) 103 Cal.App.4th 617, 625.) Alternatively, a notice of appeal filed under such circumstances may be construed as a writ petition. (*Jennifer T. v. Superior Court* (2007) 159 Cal.App.4th 254, 260.)

The Department concedes that Mother was not properly advised, at the final hearing, of the writ requirement and does not object to our construing Mother's notice of appeal as a writ petition and deciding it on the merits. The Department also implicitly concedes that the notice of appeal encompasses all of the issues Mother raises on appeal. (See *In re Madison W.* (2006) 141 Cal.App.4th 1447, 1449–1451 [liberally construing notice of appeal to encompass undesignated order issued within the appeal period].) We construe the notice of appeal as a writ petition and reach the merits of the petition.

B.    *Legal Standards*

Parents ordinarily have 12 months to reunify with children who have been removed from their care. (§ 361.5, subd. (a)(1)(A); *Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 595, fn. 4.) However, for a child under three years of age at the time of removal, court-ordered services "shall be provided for a period of six months

11

from the dispositional hearing . . . , but no longer than 12 months from the date the child entered foster care as provided in Section 361.49." (§ 361.5, subd. (a)(1)(B).) "The shortened reunification period was meant 'to give juvenile courts greater flexibility in meeting the needs of young children, "in cases with a poor prognosis for family reunification . . . ." ' [Citation.] It also represents a legislative determination that in certain situations, efforts to continue reunification services beyond the statutorily-mandated six months do not serve and protect a minor's interest." (*In re Jesse W.* (2007) 157 Cal.App.4th 49, 59.)

The parties agree that the hearing at which the court terminated services, which was originally scheduled for May 2014, was a six-month status review hearing subject to the standards of section 366.21, subdivision (e) (section 366.21(e)). Under that subdivision, "the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment. . . . The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (§ 366.21(e), 1st par.)

If the child is not returned, section 366.21(e) allows the court to terminate services and set a section 366.26 hearing unless if finds that reasonable services were not provided to the parent or that there is a substantial probability the child may be returned within six months. "If the child was under three years of age on the date of the initial removal, . . . and the court finds by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan, the court may schedule a hearing pursuant to Section 366.26 within 120 days. If, however, the court finds there is a substantial probability that the child, who was under three years of age on the date of initial removal . . . , may be returned to his or her parent or legal guardian

12

within six months or that reasonable services have not been provided, the court shall continue the case to the 12-month permanency hearing." (§ 366.21(e), 3d par.)

We review the trial court's findings of detriment (barring a child's return to parental custody) and reasonable services for substantial evidence. (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763 [detriment]; *Christopher D. v. Superior Court* (2012) 210 Cal.App.4th 60, 70 [reasonable services].) " 'We must indulge in all legitimate and reasonable inferences to uphold the [findings]. If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed.' " (*Christopher D.,* at p. 70.) On appeal, Mother "has the burden to demonstrate that there is no evidence of a sufficiently substantial character to support the juvenile court's order." (*Ibid.*)

C.   *Detriment of Returning Children to Mother's Care*

Mother argues the trial court erred in not returning the twins to Mother's care. We have no difficulty concluding that the trial court's detriment finding was supported by substantial evidence.

As noted *ante*, "[t]he failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (§ 366.21(e), 1st par.) Mother's performance under the case plan was abysmal. Shortly after the twins' placement in protective custody, she started using methamphetamine and lived with Father despite his continuing violence. She became paranoid and resisted substance abuse treatment. Although Mother entered an inpatient treatment program in June 2013, she was discharged in September after she engaged in an argument with other residents, broke a staff member's finger, and physically resisted the twins' being taken into protective custody. In October, Mother returned to Father despite his continuing violence against her and resumed using drugs. She enrolled in another residential treatment program but was discharged for hiding Father in her room. She then lived with Father on the streets, caused disruptions at her parents' house and threatened the social worker, leading to two separate restraining orders and the termination of her parent advocate services. She

returned to drug use and life on the streets until she finally entered a third inpatient treatment program in March 2014.

Mother focuses on her performance during the six months between her entry into the third treatment program and the termination of her services in late September 2014. But even during that period, Mother's participation in services was only partial. She continued to harass her parents despite a restraining order and admonitions from the court. She declined psychotropic medications until about late July. She also had not completed domestic violence classes that met the Department's requirements. Moreover, there were ample grounds for skepticism that Mother's successful completion of the residential treatment program would sufficiently mitigate the problems that led to the twins' removal in the first place. Mother had participated in many treatment programs over her lifetime, successfully completing some, yet repeatedly relapsed into drug use. She had received services for almost three years during the triplets' first dependency case, yet again lost custody of her children. In the year prior to termination of services, Mother had been extremely unstable except for short periods when she was living in structured treatment settings. She repeatedly returned to her relationship with Father despite his continuing violence. Although she obtained a 10-year restraining order against him while in the third treatment program, her resolve to enforce that restraining order after her release had not yet been tested, and her prior history with Father provided no basis for confidence in that resolve. Her mental health treatment regime remained unsettled (she was no longer under treatment by the community mental health clinic that had long monitored her condition, and she was relying on a diagnosis she received at a crisis clinic), even though she had manifested disturbing paranoid behavior during the reunification period. Mother's problems remained so severe, and her record of responding to services was so disappointing, that the court quite reasonably concluded that the twins could not safely be returned to her care.

D.      *Reasonableness of Services*

Mother also argues that the Department failed to offer or provide her with reasonable services and the court therefore had to order another six months of services. Again, we have no difficulty affirming the trial court's reasonable services finding.

The Department was required to prove, by a preponderance of the evidence, that it provided or offered reasonable reunification services to Mother. (See *In re Misako R.* (1991) 2 Cal.App.4th 538, 547–548 [where standard of proof not specified, as in § 366.21, subd. (f), preponderance standard applies]; *In re Precious J.* (1996) 42 Cal.App.4th 1463, 1478 [agency bears the burden of proof].) " ' "Reunification services implement 'the law's strong preference for maintaining the family relationships if at all possible.'. . . " . . . The department must make a " ' "good faith effort" ' " to provide reasonable services responsive to the unique needs of each family. . . . "[T]he plan . . . must be designed to eliminate those conditions which led to the juvenile court's jurisdictional finding. . . ." . . . The effort must be made to provide reasonable reunification services in spite of difficulties in doing so or the prospects of success. . . . The adequacy of the reunification plan and of the department's efforts to provide suitable services is judged according to the circumstances of the particular case . . . . "[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult." ' " (*In re K.C.* (2012) 212 Cal.App.4th 323, 329–330.) "When reunification services are ordered, the reunification plan 'must be specifically tailored to fit the circumstances of each family [citation].' " (*In re Precious J., supra,* 42 Cal.App.4th at p. 1474; *In re Misako R., supra,* 2 Cal.App.4th at p. 545 [each reunification plan must be appropriate to the individual's particular facts and circumstances].)

Mother first argues that she was not offered or provided reasonable mental health services. Although the Department was aware of her long history of mental health problems, she argues, it failed to order a psychological evaluation to obtain an accurate

15

diagnosis and medication regime, and without accurate information the Department could not properly tailor services to her mental health needs. The record does not support Mother's argument. The Department determined early in the case that Mother was receiving mental health care through a community health clinic, where a psychiatric nurse practitioner monitored her care. The nurse appeared to be familiar with Mother's mental health symptoms and the effect of substance abuse on those symptoms: she had ruled out antipsychotics to treat Mother's symptoms, attributed many of Mother's symptoms to methamphetamine use, and ensured that Mother obtained her psychotropic medications only if she tested negative for drugs. The nurse continued to monitor Mother's psychotropic medication while Mother was in the first treatment program in the summer of 2013, and it can be inferred that she continued to be available to provide Mother mental health services until she was "fired" in late January 2014. Although a new practitioner was assigned to Mother after this firing, Mother never contacted the replacement. The social worker affirmatively attempted to arrange a psychological evaluation and medication review for Mother after she entered the third treatment program in March 2014, but Mother resisted and the program staff apparently acquiesced to Mother's wishes. An evaluation evidently took place just prior to the contested hearing, and Mother might have started taking antidepressants thereafter. This development, however, was too little too late to prevent termination of services, through no fault of the Department.

Mother's other arguments are even less convincing. She claims she was clean and sober since February 2014 and appears to fault the Department for suspending drug tests. However, Mother was in a residential drug treatment program that could be expected to monitor her drug use without Department intervention. Even assuming Mother remained sober while in the program, however, there was no guarantee that her sobriety would continue after her release. On this point, Mother's checkered history in such programs raised legitimate concerns. Mother argues the Department failed to enroll her in a domestic violence program that satisfied its requirements in the summer of 2014, but she ignores the fact that she was originally ordered to take such classes in November 2013,

16

yet failed to do so and repeatedly returned to her violent relationship with Father through early 2014.  Once Mother appeared to be separated from Father and settled into a treatment program in 2014, the Department began to make arrangements for an appropriate class, but Mother's time simply ran out before the arrangements could be completed.  Finally, Mother claims the Department failed to maintain contact with her after the January 28, 2014 incident.  The record demonstrates, however, that the social worker maintained regular contact with the treatment program Mother entered in March 2014 and continued to provide or ensure she received the required services.

Mother's time had run out.  By the time the court issued its ruling more than 12 months had passed since the twins first entered foster care (June 21, 2013) as provided in section 361.49.[2]  Under section 361.5(a)(1)(B), reunification services should have been provided "no longer than" June 21, 2014.  The twins deserved permanency and stability and Mother faced too many obstacles to recovery to justify extending their dependent status any further.

In sum, the trial court reasonably found that Mother had been provided with reasonable services, terminated Mother's services, and set a section 366.26 hearing.

### III.   DISPOSITION

Mother's appeal is construed as a petition for a peremptory writ of mandate that would set aside the court's orders terminating her services and setting a section 366.26 hearing.  The petition is denied.  This opinion shall be final as to this court immediately pursuant to rules 8.452(i) and 8.490(b)(2)(A) of the California Rules of Court.

---

[2] The date the twins entered foster care was "the earlier of the date of the jurisdictional hearing" (July 18, 2013) "or the date that is 60 days after the date on which the child was initially removed from the physical custody of his or her parent or guardian" (June 21, 2013, which is 60 days after they were first taken into protective custody on April 22, 2013).  (§ 361.49.)

17

_____

BRUINIERS, J.


WE CONCUR:


_____

JONES, P. J.


_____

NEEDHAM, J.