[No. D062170. Fourth Dist., Div. One. Sept. 20, 2012.]

CHRISTOPHER D., Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Real Party in Interest.

COUNSEL

Valerie N. Lankford for Petitioner.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Real Party in Interest.

OPINION

**IRION, J.**—Christopher D. seeks writ review of a juvenile court order terminating reunification services as to his minor daughter, Sadie D., and setting a hearing under Welfare and Institutions Code section 366.26.[1] Christopher contends the court erred by finding he had been provided reasonable visitation services. We grant the petition. Christopher's request for a stay is denied.

### FACTUAL[2] AND PROCEDURAL BACKGROUND

Christopher D. and Jade H.,[3] both of whom have lengthy substance abuse histories, are the parents of Sadie D. In August 2011, police conducted a Fourth Amendment waiver search of the home where Christopher and Jade lived with then almost two-year-old Sadie. The home was cluttered with dirty clothes and dishes. In the bedroom where Sadie slept, police discovered drug paraphernalia, including needles and a pipe, which were accessible to Sadie. Both parents admitted to recent use of illegal drugs, and Jade was determined to be presently under the influence of a controlled substance. Sadie was observed to be in poor physical condition: she was dirty and had multiple bruises, a diaper rash and cavities, which were indicative of chronic neglect. Sadie was taken into protective custody. The parents were arrested and charged with child cruelty and various drug-related offenses.

The San Diego County Health and Human Services Agency (Agency) filed a juvenile dependency petition under section 300 alleging Sadie suffered, or there was a substantial risk she would suffer, serious physical harm or illness due to the parents' illegal substance abuse and that she had been left without any provision for support due to the parents' incarceration (§ 300, subds. (b), (g)).

---

[1] All statutory references are to the Welfare and Institutions Code.

[2] As Christopher's sole complaint relates to the reasonableness of visitation services, we limit our discussion to the facts relevant to the provision of that service.

[3] Jade is not a party to this writ.

At the August 17 detention hearing, the court made a prima facie finding on the petition and ordered that Sadie be detained in the approved home of a relative. The court ordered Christopher was to have liberal supervised visitation with Sadie when he was released from custody. The court also authorized contact visitation with Sadie while Christopher was incarcerated; however, such visitation was only to occur in accordance with the rules of the facility and as long as visitation was not detrimental to Sadie. The court also authorized $25 per month to be provided to Christopher to make collect telephone calls from prison to Sadie or her caretaker.

In the September 8, 2011 jurisdiction and disposition report, the social worker reported the Agency had detained Sadie with her paternal grandparents, and that Christopher remained incarcerated. The social worker recommended that the court continue Sadie's placement and order Christopher to participate in reunification services, including individual therapy, parenting education and substance abuse services following an assessment. Christopher's case plan provided for weekly in-person supervised visits with Sadie, facilitated by the social worker when appropriate, beginning September 8, 2011.

On October 14, 2011, the court held the contested jurisdiction and disposition hearing at which it made true findings on both counts of the petition. The court ordered Sadie's continued placement with her paternal grandparents. It found Christopher's case plan appropriate; ordered the Agency to provide Christopher with the case plan services; and ordered Christopher to comply with the plan. The Agency was given the discretion to lift the requirement for supervision of Christopher's visitation upon his release from custody, to expand visits to overnight, and to begin a 60-day extended trial visit with the concurrence of Sadie's counsel. All previous orders not in conflict, including those pertaining to visitation, remained in effect.

Christopher was incarcerated from August 17 until December 12, 2011. During this time Christopher had no visitation, in-person or otherwise, with Sadie. The prison telephone account authorized for Christopher was established in mid-October 2011, but the account was not operating efficiently. Christopher informed the social worker of the problems with his telephone account, and she tried to remedy the problem. Ultimately Christopher was able to use the prison telephone account, as evidenced by his collect calls from the prison to the social worker.

Christopher was released from custody on December 12 and immediately entered a residential drug treatment program sponsored by Community

Resources And Self Help (Crash).[4] Christopher was not allowed to have visits with Sadie during the first two weeks of his stay, according to the program rules. In the three-month period that followed, Christopher had two visits with Sadie. He frequently asked the social worker for additional visits with Sadie, but due to the social worker's heavy caseload and transportation issues, additional visitation proved "very difficult." Christopher was able to call Sadie from the residential treatment facility, but did not do so consistently.

Christopher left Crash on March 9, 2012, two days before he was due to complete the program. After leaving the program, Christopher called Sadie's caregivers and was able to secure an additional visit with his daughter. Jade reported to the social worker that the first thing Christopher did after leaving the program was to get a hotel room and party for three days. Within approximately a week Christopher was rearrested and held on new drug charges.

On June 11, 2012, Christopher was released from custody. He called the social worker and stated he wanted to fight for his daughter and wanted more services. Christopher was living in a sober living house and participating in criminal drug court. The social worker believed he was motivated and doing well.

On June 14, 2012, the court held a contested six-month review hearing, the focus of which was whether Christopher had received reasonable services, specifically visitation services. Without objection, the court admitted into evidence the social worker's April 12, 2012 status report and the addendum report prepared for the hearing. In the April report the social worker stated:

"Currently the parents are not visiting the minor. The father is incarcerated and the mother's whereabouts are unknown. . . .

"The father got a slow start on visits due to the fact that he was in San Diego at Crash. He was able to have a couple of visits when he was at Crash and one after he left Crash. We had agreed that when he was finished with his program and moved to North County, I would arrange for the father to visit at least three times per week. The father was arrested before that was put in place. The father's visits with Sadie were appropriate and Sadie is always very excited to see her father." The social worker opined that Christopher, who had a long-term substance abuse problem, was making good progress but became overly concerned for Jade, and he left his program two days early. According to the report, Christopher "has issues with self esteem and

---

[4] Crash, Inc., is a 24-hour residential therapeutic community for the treatment of drug/alcohol abuse.

codependency that are triggers for relapse. These issues need to be addressed in therapy and therapy services had not yet been set up for father. The father has always maintained contact with the Agency and has expressed his remorse regarding his recent relapse and his intention to get back on track and to try to get his daughter back. For this reason, it is recommended that the father receive 6 more months of services to try to address these issues."

By June, the social worker had changed her recommendation. She now recommended that Christopher's services be terminated and that a section 366.26 hearing be set. In her addendum report the social worker stated that while she had initially recommended Christopher receive another six months of reunification services, she had assumed Christopher was going to be quickly released from jail, get into another program and get back on track. However, when that did not happen, she had to reevaluate her recommendation. "When the father walked out of his treatment program with only two days left to complete, I felt that I could work with him if he was able to get into another program quickly. Unfortunately father relapsed and this led to new drug charges. It is this impulsive behavior that is of significant concern. He was doing so well and in a matter of a week or two he was back in jail."

The social worker also noted Sadie's need for stability:

"The inconsistent contact between the parents and Sadie has been difficult for her. . . . The father has not maintained any regular phone contact with Sadie during his eight months of incarceration. Sadie is excited to see father when he has had visits but her behavior indicates that she feels much safer with the caregivers. Sadie has had problems with fear and anxiety since she came into custody and the caregiver reports that she is finally getting over some of those behaviors but will periodically regress.

"In my opinion, it is crucial that Sadie have a stable permanent home right now. . . . The caregiver has really been the only consistent person in her life and she has grown to depend on her and is very bonded."

The social worker testified at the hearing and was extensively questioned about Christopher's visitation with Sadie. She acknowledged it was difficult to schedule visits between Sadie and Christopher while he was in custody and that she did not know whether he qualified for contact visits in prison because she never received a telephone call from the jail counselor. Christopher was able to have in-person visits with Sadie facilitated by the caregivers. However, there was conflict between the caregivers and Christopher. The social worker did not believe it was a good idea to put Sadie in a visitation situation in which Christopher and the caregivers were not even on speaking terms. To comply with the court's visitation orders while Christopher was in custody,

the social worker testified she "was trying to facilitate the phone calls, or to work on trying to get that phone card fixed. And then I had a few conversations with Dad. And I had gotten so far along and he was almost going to be released, we just decided to let's get you some visits when you get out, this isn't working very well."

The social worker believed in-person visitation between Christopher and Sadie could be more meaningful outside of jail, given that Christopher only had a "few days left" to serve. The social worker testified that she had learned from Sadie's caregivers that Sadie had fears and anxiety to the point where Sadie would "freak out" if she did not physically see her caregiver. The social worker stated she did not believe it would be a "quality experience" for Sadie to visit with Christopher while he was incarcerated. She conveyed that sentiment to Christopher, who did not disagree with her.

When Christopher was in the Crash program, the social worker supervised one of his two visits, and an Agency intern supervised the other. While Christopher frequently asked for more visits with Sadie, the social worker testified, "Wednesdays [were] really the only visitation day I could do it or she [(an Agency intern)] could do it, but not every Wednesday. . . . [I]t was just very difficult with the caseload during that short period of time because of the drive and the transportation from North County down to San Diego." While in the Crash program Christopher had the ability to make telephone calls to Sadie's caregivers to inquire as to her well-being, but he was not consistent in doing so. The social worker agreed that calls to Sadie, who was only two years old and not fully verbal, would not have been meaningful. After Christopher left the Crash program, he had one additional visit with Sadie, which was supervised by the relative caregivers.

In total, from August 2011 until the June 2012 review hearing, Christopher had four visits with his daughter. In those visits, Christopher was appropriate toward Sadie. She was excited to see Christopher and looked forward to their visits.

After considering the reports in evidence, the testimony of the social worker and hearing argument of counsel, the court found by clear and convincing evidence that reasonable services had been provided to the parents, but neither parent had made significant progress with the case plan.

The court further stated it had "looked very carefully at the services that have been provided to the father." According to the court, Christopher would have benefitted from counseling, but "[b]eing incarcerated for a great period of time makes it very difficult not only to establish the counseling, but to permit there to be a sufficient continuity that the father has traction in

therapy." When Christopher was in the Crash program, the social worker was appropriately waiting for him to stabilize before making counseling referrals. "And, of course, then father left Crash before that could be done."

Commenting on Christopher's visitation services, the court noted he had been incarcerated for the majority of time since disposition. However, he "maintained frequent contact with the social worker. He expressed concern about Sadie, at least insofar as trying to get phone calls established, so that they could go on a regular basis." The court found the Agency had set up a telephone account for Christopher, and when Christopher encountered problems using the telephone, the Agency was appropriate in troubleshooting the problem. The court also found Sadie had anxiety and fear issues, and that the social worker believed visitation with Christopher in the prison environment would not be in the best interests of Sadie: "To adults that setting is a fearful environment. It's loud. The aromas and odors are far different experiences. The setting is rather energized because of the nature of that communal setting." Christopher was "ever hopeful" that he was going to soon be released and communicated that to the social worker, who "held off in setting up the visits in order to give the father a chance to be free of incarceration and have the visits in a much more tranquil setting." When Christopher was released from jail, at least one of his visits occurred at a park, and the court presumed the others occurred in a tranquil environment as well. The court then stated, "The father went into the Crash program, and father stayed there for a majority of the time, and it's unfortunate that father left the program early."

In deciding to terminate services and set the section 366.26 hearing, the court stated that as to Christopher "it is a really difficult balancing. On the one hand, the positive is he has a relationship with his daughter Sadie. The other factor that must be balanced is the father's unresolved relationship dynamic issues with the mother[, which] need[] to be addressed in therapy. The father does need to address his own personal issues, not only to support his recovery but to put him in a position to better recognize the red flags with respect to relapsing." The court decided that while the balancing was difficult, Christopher would need far more than the remaining four months until the next review hearing to address those issues. Consequently, it ordered that reunification services be terminated and that a selection and implementation hearing be held under section 366.26. However, while terminating reunification services, the court continued its current visitation orders.

## DISCUSSION

■ Christopher challenges the juvenile court's findings and orders made at the six-month review hearing. He contends the court erred in finding the

Agency provided him with reasonable reunification services pursuant to section 366, subdivision (a)(1)(B), because he was not afforded visitation with Sadie while he was incarcerated and was provided inadequate visitation with her while he was in the Crash residential drug treatment program. As set forth below, we determine that substantial evidence supports the juvenile court's finding Christopher was provided reasonable visitation while incarcerated, but that there is no substantial evidence that Christopher received reasonable visitation services during the three-month period he was confined in the Crash residential drug rehabilitation facility. Accordingly, we will grant the petition.

## A.

■ "Family preservation, with the attendant reunification plan and reunification services, is the first priority when child dependency proceedings are commenced. [Citation.] Reunification services implement 'the law's strong preference for maintaining the family relationships if at all possible.' " (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1787 [42 Cal.Rptr.2d 200] (*Elizabeth R.*).) Therefore, reasonable reunification services must be offered to a parent. (*In re Brittany S.* (1993) 17 Cal.App.4th 1399, 1406 [22 Cal.Rptr.2d 50] (*Brittany S.*).) The agency must make a good faith effort to develop and implement reasonable services responsive to the unique needs of each family. (*In re Kristin W.* (1990) 222 Cal.App.3d 234, 254 [271 Cal.Rptr. 629].) The effort must be made, in spite of difficulties in doing so or the prospects of success. (*Elizabeth R.*, at p. 1790; *In re Dino E.* (1992) 6 Cal.App.4th 1768, 1777 [8 Cal.Rptr.2d 416] (*Dino E.*).) The adequacy of the reunification plan and of the agency's efforts to provide suitable services is judged according to the circumstances of the particular case. (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1362 [52 Cal.Rptr.2d 474] (*Ronell A.*).)

■ With respect to incarcerated parents, section 361.5, subdivision (e)(1) provides reunification services must be provided unless the court determines, by clear and convincing evidence, those services would be detrimental to the minor. That section reflects a public policy favoring the development of a family reunification plan even where a parent is incarcerated. (*In re Terry E.* (1986) 180 Cal.App.3d 932, 948 [225 Cal.Rptr. 803].)

Where a child is removed from a parent's custody in a dependency proceeding and reunification services are ordered, the general rule, stated in California Rules of Court, rule 5.695(h)(5), is that "the court must order visitation between the child and the parent or guardian for whom services are ordered. Visits are to be as frequent as possible, consistent with the well-being of the child."

■ Visitation is no less crucial for an incarcerated parent receiving reunification services. (§ 361.5, subd. (e)(1); *In re Dylan T.* (1998) 65 Cal.App.4th 765, 770–771 [76 Cal.Rptr.2d 684] (*Dylan T.*); *Brittany S., supra,* 17 Cal.App.4th at p. 1407.) Accordingly, in the case of an incarcerated parent, section 361.5, subdivision (e)(1)(C) states that reunification services may include "[v]isitation services, where appropriate." When reunification services are provided, it is error to deny visitation with the parent to whom the services apply unless there is sufficient evidence that visitation would be detrimental to the child. (*Dylan T.,* at pp. 769–770 [denial of visitation improper based upon minor's age alone]; *In re Jonathan M.* (1997) 53 Cal.App.4th 1234, 1236 [62 Cal.Rptr.2d 208] [arbitrary geographical limit of 50 miles insufficient]; *Brittany S.,* at p. 1407 & fn. 7 [denial of visitation improper where mother incarcerated only 36 miles away].) The absence of visitation will not only prejudice a parent's interests at a section 366.26 hearing but may "virtually assure[] the erosion (and termination) of any meaningful relationship" between the parent and child. (*Brittany S.,* at p. 1407.)

## B.

"In reviewing the reasonableness of the services provided," including visitation, "this court must view the evidence in a light most favorable to the respondent. We must indulge in all legitimate and reasonable inferences to uphold the verdict. If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545 [3 Cal.Rptr.2d 217].) Christopher has the burden to demonstrate that there is no evidence of a sufficiently substantial character to support the juvenile court's order. (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420 [159 Cal.Rptr. 460].)

## C.

In this case the juvenile court did not find that the provision of reunification services would be detrimental to Sadie, and it ordered the Agency to provide Christopher with such services. (§361.5, subd. (e)(1).) As relevant here, the court ordered that the Agency provide liberal supervised visitation between Christopher and Sadie upon Christopher's release from custody and gave the Agency the discretion to lift the supervision requirement and increase postcustody visits, with notice to Sadie's counsel. The court order provided that "father may have contact visits with the child while incarcerated," but that such visitation was authorized "only in accordance with rules of the facilities and only as long as not detrimental to minor." (Capitalization omitted.)

Christopher first contends substantial evidence does not support the court's finding that he was provided reasonable visitation services while he was incarcerated. He asserts that he was in custody for seven to eight months of Sadie's 10-month dependency, and was not provided with any visitation during that time. According to Christopher, "it was reversible error for the juvenile court to make a finding that reasonable services were provided to [him] when he was authorized contact visits with Sadie while he was incarcerated, yet the social worker did nothing to comply with that order."

We agree that the social worker demonstrated lackluster effort in implementing the court-ordered visits with Christopher while he was in custody: the social worker said arranging visits in jail was difficult (*Elizabeth R.*, *supra*, 35 Cal.App.4th at p. 1790 [the effort must be made to provide suitable services in spite of the difficulties of doing so or the prospects of success]); she acknowledged she did not call the jail to ascertain if the jail's rules permitted visitation (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1013 [70 Cal.Rptr.2d 603] ["the department should, at a minimum, have contacted the relevant institutions to determine whether there was any way to make services available to the father"]); there was no evidence that she attempted to locate someone other than the caretakers, with whom Christopher was not on speaking terms, to facilitate noncontact jail visitation with the minor (*id.* at p. 1009, fn. 5 [department made no effort to determine whether the foster mother or a relative was available to transport the child to the prison for visitation]); she appeared to focus her efforts for visits on fixing Christopher's telephone privileges so he could call Sadie, even though she was only two years old and not fully verbal (*Brittany S.*, *supra*, 17 Cal.App.4th at p. 1407 & fn. 8 [when a young child is involved, limiting contact to letters and telephone calls should be a last resort]); and in deciding to defer in-custody visitation between Christopher and Sadie, she continually relied on Christopher's statement that he was going to be released "any day." (See generally *In re Monica C.* (1994) 31 Cal.App.4th 296, 307–308 [36 Cal.Rptr.2d 910] (*Monica C.*); *Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1165–1166 [39 Cal.Rptr.2d 743] [discussing the agency's responsibility to provide reunification services to incarcerated parent under § 361.5, untethered to parent's actions or statements].)

Nevertheless, we must affirm the juvenile court's finding that reasonable visitation services were provided to Christopher while he was incarcerated. The court's visitation order authorized visits between Christopher and Sadie while he was in custody, but *only* if such visitation was not detrimental to Sadie. The court implicitly found that visitation with Christopher while he was in custody *was detrimental* to Sadie and that visitation was not authorized under such circumstances. When Christopher was first incarcerated, Sadie was not only of tender years but also was not fully verbal. From the outset of her dependency, Sadie exhibited substantial fears and anxieties.

Sadie's caregiver could not even take a shower, lie down or close her eyes, "or else Sadie would just freak out." Visitation in the prison environment, with Sadie's demonstrated fears and anxieties, was detrimental to her. (Cf. *Dylan T., supra,* 65 Cal.App.4th at p. 775 [the particular factor of the minor's age, without some supporting evidence demonstrating detriment, cannot be utilized by itself to deny visitation with the incarcerated parent].) Therefore substantial evidence supports the juvenile court's ruling, and we will not disturb it.

Christopher's reliance on *Brittany S., supra,* 17 Cal.App.4th 1399, *Monica C., supra,* 31 Cal.App.4th 296, and *In re Precious J.* (1996) 42 Cal.App.4th 1463 [50 Cal.Rptr.2d 385] in support of his position is unavailing. In both *Brittany S.* and *Monica C.,* the reunification plans approved by the court, unlike Christopher's, failed to provide for any visitation for the incarcerated parent. In contrast to *Brittany S.* and *Monica C.,* in *Precious J.* there was a very specific visitation order for the incarcerated parent—two 1-hour visits per month, which the department represented it would, but did not, facilitate. (*Precious J.,* at p. 1479.) Christopher's order was different. The court order authorized visitation for Christopher while he was incarcerated subject to certain conditions; however, the court did not specify the number or duration of such visits. Significantly, in none of the cases cited by Christopher was there evidence before the court that the minor suffered from fears and anxieties, as did Sadie, which made visitation in the prison environment detrimental to her.

We also reject Christopher's corollary argument that by allowing the Agency to eliminate visits with Sadie while he was incarcerated, the court improperly delegated its decision as to whether to allow visits. It is the juvenile court's responsibility to ensure regular parent-child visitation occurs while at the same time providing for flexibility in response to the changing needs of the child and to dynamic family circumstances. (*In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1376 [28 Cal.Rptr.2d 705] ["Visitation arrangements demand flexibility to maintain and improve the ties between a parent or guardian and child while, at the same time, protect the child's well-being."]; *In re Danielle W.* (1989) 207 Cal.App.3d 1227, 1234–1235 [255 Cal.Rptr. 344].) To sustain this balance "the child's social worker may be given responsibility to manage the actual details of the visits, including the power to determine the time, place and manner in which visits should occur." (*In re S.H.* (2003) 111 Cal.App.4th 310, 317 [3 Cal.Rptr.3d 465].) "Only when the court delegates the discretion to determine whether *any* visitation will occur does the court improperly delegate its authority and violate the separation of powers doctrine." (*In re Christopher H.* (1996) 50 Cal.App.4th

1001, 1009 [57 Cal.Rptr.2d 861], italics added.) In this case the juvenile court did not give the social worker the complete discretion to decide whether any visitation between Christopher and Sadie should occur. Instead the court adopted Christopher's reunification plan, which called for weekly supervised visits; ordered liberal supervised visits upon his release from custody; and authorized contact visits for Christopher while he was incarcerated, subject only to the custodial facility's visitation rules and the requirement that visitation not be detrimental to Sadie. (*In re Moriah T.*, *supra*, at p. 1376; *In re Christopher H.*, *supra*, at p. 1009.)

Given the above, we reject Christopher's contention that he was not provided reasonable visitation services while incarcerated. However, as we discuss hereafter, we agree with Christopher's second contention: the Agency did not make a good faith effort to provide Christopher with reasonable visitation during his confinement in the Crash residential drug treatment program.

## D.

Christopher contends substantial evidence does not support the juvenile court's finding that he was provided with reasonable visitation during the three-month period that he was confined in residential drug treatment, and that the Agency failed to make a good faith effort to implement his court-ordered visitation. Specifically, he submits that even when he was out of custody, arranging visitation pursuant to the court's order "proved too difficult for the social worker." He asserts that his confinement in the residential treatment program was from December 12, 2011, until March 9, 2012—a period of about three months. Despite the fact he was ordered to have weekly supervised visits with Sadie, and repeatedly and frequently asked the social worker for additional visitation, he only had two visits with Sadie. The social worker explained the reason for this limited visitation:

"Wednesdays [were] really the only visitation day I could do it or [the Agency intern] could do it, but not every Wednesday. . . . I had another one scheduled. I think that I had to reschedule for conflicting schedules.

"So I think it just got—you know, it was just very difficult with the caseload during that short period of time because of the drive and the transportation from North County down to San Diego." The social worker promised Christopher that when he was finished with the Crash program and

moved to North County, she would arrange for him to visit with Sadie at least three times per week.

The Agency's efforts to provide Christopher with reasonable visitation while he was in the Crash program were totally inadequate. (*Ronell A.*, *supra*, 44 Cal.App.4th at p. 1362 ["The adequacy . . . of the department's efforts are judged according to the circumstances of each case."].) While incarcerated, Christopher repeatedly sought to have visits with Sadie but, because of her fears and anxieties, visitation with her was deferred until he was released from jail. However, when Christopher was released, the social worker was *too busy* and the distance from North County to the San Diego drug rehabilitation center where Christopher was confined was *too far* to provide him with more than two visits in a three-month period. This was so even though Christopher's reunification plan called for supervised visits weekly; the court order was for "liberal" supervised visitation upon Christopher's release from custody; and while in the Crash program, Christopher repeatedly asked for additional visits. It is well established that a social worker *must* make the effort to provide *suitable* services, in spite of the difficulties of doing so or the prospects of success. (See, e.g., *Dino E.*, *supra*, 6 Cal.App.4th at p. 1777; *In re John B.* (1984) 159 Cal.App.3d 268, 273, 276 [205 Cal.Rptr. 321].) While it is true that the Agency's provision of services need not be perfect, here the social worker's facilitation of visitation between father and daughter was far from reasonable. The social worker's excuses of being *too busy* and Christopher's drug rehabilitation center being *too far* simply do not provide substantial evidence that the Agency exercised a good faith effort to provide the visitation services ordered by the court.

What is even more egregious is that the social worker discounted the visitation deficiency, saying it was only for a "short period of time." It was neither a short nor insignificant period in this young child's life or in her dependency. Sadie was under age three, and the reunification period was short. (§ 361.5, subd. (a)(2).) Because reunification efforts could be terminated after six months, the lack of a substantial opportunity for visitation during Christopher's three-month confinement in residential drug treatment was extremely adverse. In fact, the social worker had advised Christopher when he entered the Crash program that it was *"crucial that he engage in services fully"* in order to make enough progress to warrant additional services at the six-month hearing. (Italics added.) Yet, she substantially failed to provide visitation services, or therapy, during this critical period. On this record there is no clear and convincing evidence Christopher was provided with reasonable services (§ 361.5), and the court's referral order constitutes a manifest abuse of discretion.

The Agency contends that if the juvenile court committed error, it was harmless because Christopher has already received the remedy he seeks—

additional visitation. The Agency points to the court's order for posttermination visitation and asserts Christopher will have had an additional six months of supervised liberal visitation until the October 11 selection and implementation hearing. The Agency argues the additional visitation "should have given the father sufficient time to prevent the erosion of whatever relationship he had with Sadie and hopefully tighten their bond and possibly prevent the loss of his parental rights." In essence, the Agency's position is because the court continued visitation after termination of reunification services, Christopher is in the same position as he would be were we to grant the writ. He is not for two reasons.

■ First, before the court may order a section 366.26 selection and implementation hearing, the Agency must prove that it provided or offered reasonable reunification services. If it fails to carry that burden, the court may not set a section 366.26 hearing and the focus of the dependency remains family reunification. However, if we conclude the Agency's failure to provide reasonable visitation services is harmless because the court ordered continued visitation after termination of reunification services, the focus of the dependency will remain on permanency planning. Services will no longer be provided to Christopher. Additionally, Christopher will bear the significant burden of proving that the posttermination visitation has either (1) caused a change of circumstances warranting modification of the court's order setting a selection and implementation hearing (§ 388; *In re Michael B.* (1992) 8 Cal.App.4th 1698, 1703 [11 Cal.Rptr.2d 290]; *In re Edward R.* (1993) 12 Cal.App.4th 116, 127 [15 Cal.Rptr.2d 308]) or (2) changed the parent-child relationship such that the beneficial parent-child relationship exception to adoption applies (§ 366.26, subd. (c)(1)(B)(i)).

Second, a grant of writ relief will reinstate *all* of Christopher's reunification services; deeming the error harmless because the court ordered continued visitation after termination of reunification services will not. In this case, reinstatement of reunification services is important because Christopher will receive visitation with Sadie and have an opportunity to repair the erosion of his relationship with her. Also, importantly, he will receive the therapy which the social worker said he needed, but had not yet been provided, to address his issues of self-esteem and codependency that are triggers for relapse.

We thus fail to see how the court's order for continued visitation after termination of reunification services renders the error harmless. Accordingly, we grant the petition.

## DISPOSITION

Let a peremptory writ of mandate issue directing the juvenile court to vacate its order for a section 366.26 hearing. On remand, the juvenile court shall enter a new and different order, resuming the six-month status of the case and providing Christopher reunification services comporting with his reunification plan and this decision. The requested stay is denied.

McConnell, P. J., and Nares, J., concurred.