Filed 6/6/23  In re J.M. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re J.M., a Person Coming Under the Juvenile Court Law. | D081355 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. EJ4679) |
| Plaintiff and Respondent, | |
| v. | |
| S.S., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Mark T. Cumba, Judge.  Reversed.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Evangelina Woo, Deputy County Counsel, for Plaintiff and Respondent.

S.S. (Mother) appeals the juvenile court's December 8, 2022 order terminating her reunification services. Mother contends the San Diego County Health and Human Services Agency (Agency) failed to provide her with appropriate individual therapy to address her mental health issues. As a result, she argues the juvenile court erred in concluding that the Agency had provided her with reasonable services. We agree and reverse the order.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Initial Proceedings*

J.M., now age 12, is the child of Mother and nonappealing father, M.M. (Father). The family first came to the Agency's attention in 2013 and was the subject of eight referrals before the incident that resulted in J.M.'s removal. The referral allegations involved one or both parents drinking excessively, the parents screaming at each other, and multiple instances of alleged domestic violence between the parents.[1] Several of the referrals involved concern that Mother suffered from untreated mental health issues. The parents also called the police on each other in early 2021.

A.    *Initiation of Dependency Proceedings and Initial Reunification Efforts*

In late June 2021, Mother called law enforcement to report a verbal argument with Father and to request that officers remove him from their shared apartment. Responding officers observed that both parents were under the influence of alcohol. After Mother made statements they perceived as suicidal, officers transported her to the hospital on a Welfare and

_____

[1]    The Agency did not have contact with the family between 2014 and 2017 when Mother and J.M. resided in Hungary.

Institutions Code[2] section 5150 hold. The paternal grandmother[3] took J.M. into her care the next day. Two days later, Father arrived at her home intoxicated. The grandmother called law enforcement because Father had passed out in his car blocking the driveway.

J.M., who was 10 years old at the time, reported the yelling in her home was "almost constant" and that her mother was a "little psycho." She said both parents used marijuana inside the residence, and she inhaled it as a result. J.M. said Mother drank at least one bottle of alcohol every day but hid her alcohol bottles in places where Father never looked. Father admitted he had been dealing with alcoholism throughout his life and said that Mother consumed a bottle or two of wine per day. Mother denied having a drinking problem.

Declining the Agency's advice, Mother did not seek a restraining order against Father and instead left J.M. with the grandparents and departed for Florida sometime in late July. In mid-August 2021, the grandparents reported that Father drove J.M. home from their house while intoxicated. When J.M. did not attend school for the next two days, the grandparents, a social worker, and law enforcement went to the home to check on her, but Father would not open the door. After a social worker advised Mother of the incident, she blamed the grandmother for not keeping J.M. safe from Father, but again declined to seek a restraining order because she did not trust the police and did not believe it would help.

The Agency removed J.M. from the home at the end of August 2021 and placed her with the grandparents. The Agency filed a petition under section

---

[2]    All statutory references are to the Welfare and Institutions Code.

[3]    All references to the grandparents are to the paternal grandparents.

3

300, subdivision (b)(1), based on the parents' alcohol use, Mother's failure to protect J.M., the June 2021 incident involving the police, Father's subsequent intoxication at the grandparents' house, and the allegation that Father later drove J.M. while intoxicated. At the detention hearing, the court found that a prima facie showing had been made on the petition, detained the child with the grandparents, and ordered provision of voluntary services and supervised visitation for the parents.

Mother returned from Florida in early September 2021 and social workers subsequently interviewed each family member. J.M. expressed that the fighting and police involvement had caused her to contemplate suicide in the past. She said sometimes Mother was scary because one minute she would be nice and the next moment she became angry. Mother explained she used marijuana for glaucoma and that Father used it to treat migraines. She denied drinking every day but said that she preferred champagne and would typically drink the whole bottle because otherwise it would go flat. She said she had lost jobs and housing because of Father's drinking and their fighting. Father reported that he had just moved into a sober living facility in September 2021, was participating in substance abuse treatment services, and had completed a therapy intake assessment.

In mid-September 2021, the Agency referred Mother for an assessment with a substance abuse specialist, individual therapy,[4] family support through Incredible Families, and drug testing. The social worker submitted

---

[4]     Her case plan stated, "[i]f recommended by service providers, or at the mother's request, [Mother] will participate in individual counseling with a TERM or Agency-approved therapist." "The Treatment Evaluation Review Management program (TERM) are therapists approved by the Agency and juvenile court to provide services to parents in dependency cases and file reports directly with the court." (*In re M.F.* (2019) 32 Cal.App.5th 1, 9, fn. 3.)

referrals for Father to Incredible Families and individual therapy. Mother promptly completed her assessment with the substance abuse specialist, began consistently attending sessions with her substance abuse counselor at Parent Care, and submitted to random alcohol tests. She refused services for herself or J.M. with Incredible Families.

With regard to individual therapy, the social worker received an email on September 15, 2021 from OPTUM[5] stating: "The client is being referred for individual therapy to address protective parenting, mental health, trauma, boundaries, co-parenting, coping, and ability to safety parent. Considering that [domestic violence] group therapy is provided by a mental health clinician that addresses these areas, please consult with CWS Staff Psychologist to determine if [domestic violence] group therapy would be the most appropriate clinical referral. Please note, the group therapist conducts assessments and can determine appropriateness for group therapy." (Italics omitted.) After consulting with the Agency's staff psychologist in October 2021, social workers referred Mother to a domestic violence victims' group and Father to a domestic violence offenders' group, with authorization for individual therapy if the group providers recommended it. After subsequently learning that Mother had been the aggressor in several domestic violence incidents and consulting again with the staff psychologist,

---

[5] According to the Agency, "Optum is responsible for contracting providers to the TERM network who have competence in evaluating and treating clients referred for child maltreatment or delinquency concerns. Optum also provides quality oversight of treatment plans and evaluation reports prepared for these clients." (https://www.optumsandiego.com/content/SanDiego/sandiego/en/county-staff--providers/term-providers1.html [as of June 5, 2023 - https://perma.cc/3STG-FWF6].)

Agency social workers referred Mother to the domestic violence offender group.

During this reporting period, the parents had separate in-person and phone visits with J.M. When asked if she would like unsupervised visits with Mother, J.M. replied, "No thank you. . . . Not until she has a job and is checked for alcohol every day, even the weekends." As to Father, she also said, "No thanks, I'd rather be supervised." J.M. expressed that she felt safe at her grandparents' house and wished to continue living with them.

At the contested adjudication and disposition hearing in October 2021, the juvenile court sustained the petition, ordered the Agency to provide services to the parents, and modified the case plans to require both parents to "participate in individual therapy, and . . . attend an appropriate [domestic violence] course if recommended by their individual therapists." The court explained this may be a case where the parents only fight when they are intoxicated. It ordered individual therapy so a therapist could get to know each of the parents and then decide if a domestic violence course was appropriate.

B.    *Six-Month Review Hearing*

In January 2022, Mother's substance abuse counselor from Parent Care, Terri Talmadge, "recommended [Mother's] mental health be addressed as she fe[lt] there m[ight] be a personality disorder which [wa]s causing re-victimization and impacting her parenting." Valarie Padra Najera, the therapist leading Mother's domestic violence victims' group, stated in February 2022 that Mother did not qualify for individual therapy as she did not disclose any mental health concerns. The provider suggested Mother's mood swings were likely due to her substance abuse. However, in early April the same provider stated that although she had diagnosed Mother with an

6

alcohol abuse disorder, Mother might also have a mood disorder or personality disorder. Meanwhile, Talmadge recommended in March and again in April that Mother undergo a psychological evaluation to address her "emotional pain as her perception is everyone is a threat."

By the end of April 2022, Mother had completed her substance abuse program through Parent Care and was engaged in aftercare but was not attending recovery support group meetings. She said she was working with an Alcoholics Anonymous and codependency sponsor but did not provide the Agency with contact information. She continued to drug test clean, except for marijuana. But the Agency reported that Mother "ha[d] a very difficult time managing her anger and [would] often begin to spout out hurtful things to others and become confrontation[al] with them when she d[id] not agree with their statements." She also would "become fixated on topics and bring them up repeatedly." Mother apparently had stopped attending her domestic violence group at some point and was directed to resume participating. The Agency recommended in April 2022 that Mother undergo a psychological evaluation.

Father also had completed substance abuse treatment and begun aftercare. He too had a sponsor and tested clean except for marijuana. Additionally, Father attended biweekly recovery support group meetings and participated in individual therapy, although the Agency remained concerned that Father had limited insight into his substance abuse.

Mother, Father, and J.M. had begun attending Incredible Families, where the parents took parenting courses and engaged in therapeutic visitation with J.M. In April, an Incredible Families clinician noted that "progress with the mother is difficult due to her mental health as it affects

7

her ability to connect" and that "the parents are more invested in their 'custody battle' then [*sic*] their daughter."

The Agency had concerns about Mother's behavior during visits with J.M. and the child expressed that she was fearful of Mother. When left unattended with J.M. for even under a minute, Mother reportedly attempted to manipulate her. In January 2022, J.M. asked a social worker to supervise her calls "so my mom doesn't insult me or my grandparents." Meanwhile, Father's visits were reported to be going well and he progressed in April to one hour of unsupervised visitation.

The Agency recommended an additional six months of services. It felt that "once the mother is able to receive the necessary mental health treatment the child will be less resistant to reunifying with her as her primary concern is not feeling safe with the mother due to her mental health."

At the initial April 26, 2022 six-month review hearing, Mother's counsel said Mother did not object to the Agency's recommendation that she undergo a psychological evaluation so the court made the order. Mother fully participated in a psychological assessment with Joseph McCullaugh, Ph.D., on May 11. Although the report is dated May 25, an Agency status review report indicates the Agency did not receive the psychological evaluation report until July 14. The record provides no explanation for the delay.

During the June 3, 2022 contested six-month review hearing, the court addressed a section 388 petition presented by J.M.'s counsel seeking to halt visitation and conjoint therapy with Mother. Thinking about visits with Mother reportedly made J.M. feel upset and depressed, and led to her having difficulty sleeping. She requested the court find visitation detrimental to her and terminate visits until Mother made progress in therapy. The court found

a prima facie showing of changed circumstances and temporarily suspended Mother's visitation pending a full evidentiary hearing. It also concluded that reasonable services had been provided or offered to both parents. Mother did not appeal this reasonable services finding.

After hearing argument at the contested section 388 hearing, the juvenile court granted J.M.'s petition and left it for J.M. to request to see Mother again if and when she was ready.[6] J.M. expressed openness to talking to Mother on the phone for Mother's birthday and on special occasions. J.M. also said she felt comfortable with Father and was ready to try an overnight visit.

C.     *Mental Health Services Offered to Mother*

In the psychological assessment, Dr. McCullaugh noted that Mother adamantly denied the allegations in this case and their negative impact on J.M. Instead, she attributed sole responsibility for the case to Father. She saw little she could have done to prevent her current circumstances and did not acknowledge her contributions to the family's involvement with child welfare services. The psychologist indicated "[t]his will remain an important element to both address and challenge, pragmatically and therapeutically."

Under the heading "diagnostic considerations" Dr. McCullaugh wrote "Unspecified Trauma-Related Disorder – RULE OUT," "Alcohol Use Disorder

---

[6]     Mother appealed and we conditionally reversed the order for lack of compliance with the Indian Child Welfare Act (ICWA). Following additional proceedings, the court determined the ICWA did not apply, and the order was reinstated.

– Unspecified," and "Cluster 'A' Personality Traits."[7]  He recommended six to 12 months of treatment but indicated that "[p]progress in her case is additionally predicated on [Mother's] willingness, motivation, and receptivity to the suggestions, directions, and interventions offered, adjusting her approach and reconsidering what is a priority for [J.M.'s] safety." Dr. McCullaugh said her ability to recognize the need for support and to seek help has been compromised, so "reliance on her view of self-assessed needs is not recommended."  In recommending individual therapy, he noted the need for a therapist "comfortable challenging [Mother's] denial and self-favorable presentation, and sub-diagnostic persecutory/paranoid ideation" given that her self-view is prone to deflecting and preventing progress.

In response to the psychological evaluation received on July 14, 2022, the Agency submitted a referral on August 23 for Mother to receive individual therapy for a personality disorder.  On September 9, OPTUM contacted the Agency to say few providers held the clinical specialties needed for this client.  It stated that Mark Guynn, a therapist, was so qualified and the Agency assigned Mother to Guynn the same day.  Guynn met with Mother once, but told the Agency on September 30 that he would need to refer Mother back to OPTUM because she was "not mentally available to do therapy."  Meanwhile, Najera reported that, despite completing 24 of 26 domestic violence classes, Mother's progress was minimal.  However, she said Mother could complete the program regardless of whether she took any

_____

7    Later the psychologist clarified that while Mother's presentation did not warrant a diagnosis of delusional disorder or paranoid personality disorder, she exhibited traits consistent with "Cluster 'A' (Paranoid) personality disorders."  He further explained that he lacked the longitudinal portrait of her functioning necessary to make a personality disorder diagnosis.

accountability of her actions.  She reiterated her view that Mother required individual therapy for a likely personality disorder.

Guynn contacted the Agency again on October 25, 2022, to report that he discharged Mother on October 3 because she "emphatically denied" having a mental health issue, she said she did not need treatment, and "they could not develop treatment objectives they could work on."  Mother also compulsively texted him after their meeting.  The Agency report regarding Guynn's response also states:  "He indicated feeling as though the mother needed more experience with someone that works with those with personality disorder so they can discuss her normal delusionary thing, big themes, paranoia, and persecution."  Guynn also "indicated feeling that she needed therapy for someone with a personality disorder."  It is not clear from Guynn's statements to the Agency whether he felt Mother needed someone with *more* experience with personality disorder or whether he was acknowledging that he did not have experience treating personality disorder.

The Agency submitted a new referral the same day.  OPTUM informed the Agency on November 1, 2022, that Dr. Matthews was qualified and willing to treat a personality disorder, but not domestic violence issues.  The Agency therefore kept Mother with Najera in the domestic violence group and assigned Mother to Dr. Matthews for individual therapy two days later.  Mother was only able to meet with Dr. Matthews twice before the contested 12-month review hearing, when the court terminated her reunification services.  Dr. Matthews reported that while Mother did show up, she was unsure if Mother would engage in treatment.

D.     *Subsequent Proceedings*[8]

The Agency initially recommended continuing reunification services for both parents until the 18-month review. However, the social worker reported that Mother was unable to advocate for her child in a nonphysical, nonintimidating way; resorting instead to blaming, cursing, and screaming at social workers and her service providers for long periods of time.

At an October 2022 hearing, the court stated that "if the parties were to submit, I would not be following the recommendations with regard to Mom because I can't make the three-prong finding" necessary to justify allowing additional time to return J.M. to her parent's physical custody under section 366.21, subdivision (g)(1).[9] Agency counsel then interjected to clarify that it was requesting a continuance to provide notice that it was changing its

---

[8]     We note that the court held four *Marsden* hearings at Mother's request between September 2021 and August 2022. The court did not find cause to relieve appointed counsel.

[9]     If court-ordered services have been provided for the required time period, in this case 12 months, and the child has not been returned to the parent, the court will continue the case for up to six months "if it finds that there is a substantial probability that the child will be returned to the physical custody of their parent or legal guardian and safely maintained in the home within the extended period of time or that reasonable services have not been provided to the parent or legal guardian." (§ 366.21, subd. (g)(1).) To find a substantial probability that the child will be returned to their parent's physical custody, the court must find all of the following: "(A) That the parent or legal guardian has consistently and regularly contacted and visited with the child. [¶] (B) That the parent or legal guardian has made significant progress in resolving problems that led to the child's removal from the home. [¶] (C) The parent or legal guardian has demonstrated the capacity and ability both to complete the objectives of their treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (*Ibid.*)

recommendation to termination of Mother's services. The court granted the request. During a subsequent hearing, J.M.'s attorney stated that J.M. wished for Mother to continue getting as much help as possible but did not want to reunify.

In its November 2022 report, the Agency recommended terminating Mother's services, citing the suspension of her visitation, her lack of insight into the protective issues of domestic violence and substance abuse despite significant treatment, her denial of any mental health concerns, and her use of violence and hostility "against the Agency, caregivers, the father, and service providers she does not agree with." In the Agency's view, "Mother has not demonstrated the capacity and ability to complete the objectives of her treatment plan and provide for the child's safety, protection, and physical and emotional well-being."

The court held a contested 12-month review hearing on December 8, 2022. Mother's counsel admitted into evidence a letter and a "Response to Addendum" from Mother. He argued that the Agency and caregivers created a rift between Mother and J.M., which interfered with visitation. As to her case plan, counsel submitted that Mother had made substantial progress because she completed a substance abuse treatment program, a parenting education course, and domestic violences services, in addition to testing negative for controlled substances. He relayed Mother's view that the only reason she had not made as much progress in individual therapy was because she had "been ping-ponged around with different providers who have been unable to work with her." The Agency contended that despite completing all of these services, Mother had not made significant progress in resolving the problems that led to removal because she still had not taken responsibility or learned the things she needed to learn to safely parent J.M. J.M.'s counsel

13

joined the Agency's request to terminate services, citing Mother's lack of insight and continued volatility. She also argued the court should maintain its detriment finding as to Mother's visitation and said that J.M. did not want to live with Mother.

The juvenile court found by clear and convincing evidence that reasonable services had been offered to both parents but did not elaborate on that finding. It then found there was a substantial probability J.M. would be returned to Father by the 18-month review but concluded Mother had not met the standard. In particular, the court noted that Mother's visitation had not been consistent and regular and that, although Mother had completed some programs, "[c]ompletion of programs does not equate to significant progress." The court said, "the evidence that has been submitted in the reports indicates, still, a lack of acknowledgment in the mother's role in the incident, the limited or lack of insight on the cycle of violence, [and] the lack of acknowledgment of understanding the impact of those incidents on the minor." As to the third prong of the test, the court noted that Mother's mood was still "unstable" and "volatile," and though her "violence and hostility" was now being directed at others instead of Father or J.M., the totality of the evidence indicated that Mother "ha[d] not, at this point, demonstrated the capacity and ability to complete the objectives of the treatment plan." The court concluded there was no substantial probability that J.M. would be returned to Mother by the 18-month date and terminated her reunification services.

## DISCUSSION

## I.

### *Mother Did Not Waive Her Claim of Error*

The Agency argues Mother waived her claim that the trial court erred as to its finding of reasonable services because she did not raise the issue at the time she requested a contested 12-month review hearing. We disagree.

Courts and parties frequently use the terms "forfeiture" and "waiver" interchangeably, but they are distinct legal concepts. Where, as here, the claim is that a party gave up the right to challenge an issue on appeal because the party could have timely objected or otherwise raised the issue in the trial court but did not, the proper term is forfeiture. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) The purpose of the forfeiture rule is "to encourage parties to bring errors to the attention of the trial court, so that they may be corrected." (*Id.* at p. 1293.) This forfeiture principle applies equally to dependency matters and precludes a party from "standing by silently until the conclusion of the proceedings." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 222.)

Here, we conclude Mother sufficiently brought her contention that the Agency failed to provide reasonable reunification services to the juvenile court's attention and preserved the issue for appeal. At the November 2022 12-month review hearing, Mother requested a contested hearing on the issue of "continued services." During the contested 12-month review hearing on December 8, 2022, Mother's counsel addressed the factors set forth in section 366.21, subdivision (g)(1), in arguing that services should be continued to the 18-month date because there was a substantial probability J.M. would be returned. Counsel highlighted that Mother had not made much progress in individual therapy "because she has been ping-ponged around with different

15

providers who have been unable to work with her." Counsel also admitted into evidence Mother's letter in which she explained that she had been "waiting for a Term Therapist since the last referral was unable to accept [her] case." In her "Response to Addendum," Mother further stated: "My only goal is to reunite with my only child, and despite individual therapy being requested by the court, and my child, I have been ping ponged around for over a year and a half through no fault of my own, and [am] finally on session three as of this week. For this reason of extreme delay that was out of my control, among other reasons I am requesting an exten[s]ion of time to allow progress with visitation while pursuing the individual therapy as originally ordered a year and a half ago." Collectively, this evidence and argument made clear Mother's view that she had not been provided reasonable individual therapy, as ordered, during the reunification period. We do not believe it can reasonably be said that Mother stood by silently and forfeited this claim on appeal.

## II.

*Substantial Evidence Does Not Support the Juvenile Court's Finding That Reasonable Services Were Offered*

Mother contends the Agency did not offer her reasonable services because she was not provided with an individual therapist qualified and willing to deal with her diagnosed mental health needs until one month before the contested 12-month review hearing. And so she argues the trial court erred in finding the Agency offered her reasonable services. On this record, we agree.

The law typically requires the juvenile court to order family reunification services for the mother and father of a child who has been removed from parental custody and placed under the court's jurisdiction. (§ 361.5, subd. (a).) These services are subject to statutory time limitations.

16

If, as in this case, the child was older than three years of age upon removal, "court-ordered services shall be provided beginning with the dispositional hearing and ending 12 months after the date the child entered foster care as provided in [s]ection 361.49, unless the child is returned to the home of the parent or guardian." (§ 361.5, subd. (a)(1)(A).)

During the reunification stage, the juvenile court ordinarily holds review hearings at six-month intervals to evaluate the status of reunification efforts and appropriate next steps. (*Michael G. v. Superior Court of Orange County* (2023) 14 Cal.5th 609, 625 (*Michael G.*); § 366.21.) "If, at the six- or 12-month status review hearing, the court finds that there is a substantial probability the child may be returned to her parent within six months, or that reasonable services were not provided to the parent, the court extends reunification services for an additional six months rather than proceed to the final stage of dependency proceedings, permanency planning." (*Michael G.*, at p. 625.) The court may not set a section 366.26 hearing "unless there is clear and convincing evidence that reasonable services have been provided or offered to the parent or legal guardian." (§ 366.21, subd. (g)(1)(ii).)

The purpose of reunification services is " 'to facilitate the return of a dependent child to parental custody.' " (*In re Jaden E.* (2014) 229 Cal.App.4th 1277, 1281.) "The agency must make a good faith effort to develop and implement reasonable services responsive to the unique needs of each family. [Citation.] The effort must be made, in spite of difficulties in doing so or the prospects of success. [Citations.] The adequacy of the reunification plan and of the agency's efforts to provide suitable services is judged according to the circumstances of the particular case." (*Christopher D. v. Superior Court* (2012) 210 Cal.App.4th 60, 69 (*Christopher D.*).)

17

We review a juvenile court's finding that reasonable services were provided for substantial evidence. (*T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1238 (*T.J.*).) "Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 996.)[10]

Turning to the facts of this case, we note the Agency had notice at the inception of the case, based on prior referrals, that Mother likely had mental health issues. But this came from nonprofessionals and largely

---

[10] Effective January 1, 2023, section 366.21 requires the juvenile court's finding that reasonable services were offered to be supported by clear and convincing evidence. The prior version of section 366.21, which was in effect at the December 8, 2022 contested 12-month review hearing in this case, did not specify the standard of proof required at the 12-month review hearing unless the court simultaneously set a section 366.26 hearing (which it did not in this case). Thus, the default burden of proof would have been the preponderance of the evidence standard. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547–548 citing Evid. Code, § 115.)

The court here applied the clear and convincing evidence standard. But because this higher burden of proof was not required at the time of the decision, we do not apply the heightened standard of review applicable to decisions made by clear and convincing evidence in assessing whether the juvenile court based its determination on sufficient evidence. (See *Conservatorship of O.B.*, *supra*, 9 Cal.5th at pp. 995–996 ["when reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true"].) Nonetheless, for reasons we shall explain, substantial evidence did not support the finding under either standard of proof.

unsubstantiated allegations. However, in January 2022, Mother's substance abuse counselor (Talmadge) notified the Agency of a possible personality disorder. In March 2022, she recommended a psychological evaluation. In April 2022, Talmadge again recommended a psychological evaluation; Mother's domestic violence group therapist (Najera) noted the possibility of a mood or personality disorder; and the Incredible Families clinician stated that Mother's mental health was impeding her progress.

Although the Agency arguably knew from the beginning of the case that a mental health problem was a, if not the, primary issue underlying Mother's inability to safely parent J.M., by April 2022, it was abundantly clear that Mother's psychological issue—which most likely was a personality disorder—was hampering her ability to make progress on her case plan. By mid-July, the Agency had professional confirmation via the psychological evaluation that Mother: (a) had traits consistent with paranoid personality disorder; (b) was unable to accurately assess her own needs; and (c) had a "compromised" ability to seek help. Therefore, the Agency was required to make a good faith effort to develop and implement reasonable services responsive to these mental health needs, even if it was difficult to do so. (See *Christopher D., supra,* 210 Cal.App.4th at p. 69.)

Unfortunately, the Agency was not able to implement appropriate services responsive to Mother's mental health needs. For unexplained reasons, the Agency did not receive the psychological evaluation until a month and a half after it seemingly was completed. Then there was another one-month delay before the Agency submitted a referral for individual therapy. Mother did not actually receive therapeutic treatment at this time because the assigned therapist, Guynn, relied on her denial of need as grounds for discharging her from therapy, even though she had been

19

diagnosed as unable to assess her own needs. His statements also suggest he did not have sufficient experience with personality disorders to treat her. There was then another delay of over a month between when the Agency learned Guynn was not going to treat Mother and when she was assigned to Dr. Matthews in November 2022. Though Dr. McCullaugh may have been responsible for part of the delay, and OPTUM may have misled the Agency regarding Guynn's qualifications, the end result was that Mother was not "provided or offered" reasonable services during this time frame. (§ 366.21 subd. (f)(1)(A); see also *T.J.*, *supra*, 21 Cal.App.5th at p. 1244 [vacating reasonable services finding, even though the mother was responsible for part of the delay, where the mother was only able to engage in two individual therapy sessions before the Agency recommended termination of services].) Ultimately, the delays resulted in Mother not having access to individual therapy targeted to her diagnosed needs for virtually the entire period between the contested six-month review hearing in June 2022 and the contested 12-month review hearing in December 2022.

The juvenile court relied on, as the Agency urged, the Agency's provision of domestic violence, substance abuse, and family therapy services to find that the Agency provided reasonable services. But Mother's providers universally agreed that her mental illness impaired her ability to make progress in these other services. Thus, the effective lack of treatment for her mental health issues inhibited Mother's ability to benefit from any of the other programs.

"To support a finding reasonable services were offered or provided, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course

20

of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult. . . .' [Citation.] 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.' " (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426.) In this case, the Agency identified traits consistent with a paranoid personality disorder as interfering with Mother's ability to parent J.M. and to benefit from the other services. It also acknowledged at the six-month review hearing that mental health treatment would lessen J.M.'s resistance to reunifying with her. Given that showing consistent and positive visitation was vital to Mother's efforts to reunify with J.M., prompt provision of individual therapy services was also key to her efforts to regain visitation. Yet Mother was not given the opportunity to even *begin* individual therapy geared toward treating her specific mental health concern until *after* she completed all of the other services and until *after* her second six-month window for proving visitation would no longer be detrimental had closed.

As a result, it cannot be said that the Agency offered services designed to give Mother a realistic chance to remedy the problems that resulted in her loss of custody. And, by extension, it was not reasonable for the juvenile court to conclude that Mother had not "demonstrated the capacity and ability to complete the objectives of the treatment plan" when she had not been provided with the one service—individual therapy—directed to actually improving her ability to complete the treatment plan objectives. Under these circumstances, we believe Mother has met her burden of demonstrating "that there is no evidence of a sufficiently substantial character to support the juvenile court's order." (*Christopher D., supra,* 210 Cal.App.4th at p. 70.)

21

We are cognizant of the fact that neither the Agency nor the juvenile court could provide Mother the six months to a year Dr. McCullaugh opined it would take for Mother to "develop and sharpen skills to cope with the issues she is currently facing" before even beginning the other necessary services. But she did not have the opportunity to even show progress. As previously noted, reasonable services must be offered regardless of the prospects of success. (*Christopher D., supra*, 210 Cal.App.4th at p. 69.) The record demonstrates that Mother is difficult to work with, but she showed willingness to attend therapy with Dr. Matthews and deserved a reasonable amount of time to demonstrate progress.

We offer no opinion as to whether Mother will be able to overcome the roadblocks to reunification with appropriate services. But for the reasons we have discussed, we conclude substantial evidence did not support the juvenile court's finding at the contested 12-month review hearing that the Agency offered reasonable services.[11]

---

[11]  The Agency requests that we take judicial notice of a minute order from the 18-month review hearing held after the filing of the instant appeal. "It has long been the general rule and understanding that 'an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration.' " (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.) Although we may, under limited circumstances, consider additional evidence, we decline to do so here. There is no evidence the juvenile court has terminated jurisdiction so regardless of the current procedural posture of the case, our conclusion remains relevant to the underlying proceedings. If J.M. is out of her custody, Mother would be entitled to an additional period of reunification services. (*In re A.G.* (2017) 12 Cal.App.5th 994, 1005 [[t]he remedy for the failure to provide court-ordered reunification services to a parent is to provide an additional period of reunification services to that parent"].) And even if J.M. has been returned to Father's custody, "[a]n erroneous reasonable services finding may have consequences for the parent if the child is removed again from the other parent's custody during the dependency proceedings (§ 361.5, subd (a)(1)

DISPOSITION

The December 8, 2022 order finding that the Agency offered reasonable services is vacated and the order terminating Mother's reunification services is reversed.

DO, J.

WE CONCUR:


DATO, Acting P. J.


KELETY, J.

---

[time limitations on services]), or if the parent is involved in a future dependency proceeding (see, e.g., § 361.5, subd. (b)(10) [permitting court to bypass services where parent has not made reasonable efforts to remedy problems])." (*Ibid.*) Additionally, "at the six- and 12-month status hearings, the court must find that the parent has been provided or offered reasonable reunification services before the court can proceed to set a hearing to decide whether to terminate parental rights and select a permanent plan for the child." (*Michael G., supra,* 14 Cal.5th at p. 625.)