Filed 10/11/13  In re N.C. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re N.C., a Person Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>John C.,<br><br>          Defendant and Appellant. | A136480<br><br>(Sonoma County<br>Super. Ct. No. 3682DEP) |

John C. appeals from the juvenile court's order terminating visitation with his daughter pending a hearing pursuant to Welfare and Institutions Code section 366.26.[1] He contends the order is not supported by substantial evidence, because the fact that visits were detrimental to the child when she visited him in jail does not mean that visits would be detrimental to her after his release.  We will affirm the order.

I.  FACTS AND PROCEDURAL HISTORY

N.C. is a female minor born in 2010.  Her mother is N.M.  Appellant John C. was identified in the dependency petition as N.C.'s presumed father.  For clarity, we refer to them respectively as the child, the mother, and appellant.

---

[1] All statutory references are to the Welfare and Institutions Code.

The child entered the dependency system when she was approximately 11 months old in July 2011, on allegations that appellant physically assaulted the mother and had a substance abuse problem, placing the child at a substantial risk of harm.

In August 2011, the juvenile court sustained the dependency petition, declared the child a dependent of the court, removed her from the parents' physical custody, ordered reunification services for both parents, and directed the parents to comply with case plans. Appellant was required, among other things, to abstain from drugs and alcohol, submit to random drug testing, refrain from domestic violence, and "[v]isit [the child] consistently and on-time as arranged by the [social] worker."

A. *Appellant's Incarceration and Visitation*

Before the end of August 2011, appellant tested positive for methamphetamine. The following month, he was arrested for domestic violence against the mother, who told police that he had threatened to kill both her and the child. Appellant was returned to jail.

At a progress report hearing in November 2011, the court warned appellant that his parental rights would be terminated if he continued with his lifestyle. Nonetheless, after he was released from jail that month, appellant was arrested and incarcerated for threatening the mother again.

In a six month status report filed January 27, 2012, respondent Sonoma County Human Services Department (Department) advised that appellant would remain incarcerated until June 13, 2012. The Department acknowledged that appellant had visitation with the child on alternating weeks. The visits were positive, but the child struggled after the visits, in that she was anxious and it was hard for her to settle down. The Department recommended that services not be continued for either parent.

On April 2, 2012, the Department filed a "Visitation Memo" with the court, expressing concern about the child's emotional well-being in regard to her visits with appellant. Beginning in January 2012, while visits were held at the Main Adult Detention Facility, the child cried and seemed stressed after leaving her caregiver (foster parent). More specifically, she "appeared distressed when entering the facility and visiting with her father[,] causing the last visit at that facility to be ended early." Visits were moved to

2

the North County jail facility, but those visits were also "problematic" and appeared to cause the child emotional distress. The Visitation Memo explained: "On March 1, 2012, when the child visited with the father[,] Social Worker Assistant[] Sandra Ochoa-Ortiz reported that the child was shut down and provided no eye contact to the father. On March 13, 2012, Ms. Ochoa-Ortiz reported that when the caregiver brought the child to visit with her father, the child clung to the caregiver and screamed [']mama['] over and over again. She said that the father tried to calm her and console her and only succeeded in quieting her to a point to where she was sobbing silently." Nine minutes into the visit, appellant asked the child if she wanted to return to the caregiver if she gave him a kiss, and she replied "yes" and stopped crying immediately. The social worker concluded: "visits between the father and the child while he is in custody are detrimental and should not occur."

B. *Six Month Review Hearing*

The six month review hearing was held on April 10, 2012; the Department recommended termination of services and a section 366.26 hearing.

Social worker Brenda Fonarev testified that appellant had not complied with any aspect of his case plan. She recounted that appellant had been arrested in November 2011 for hitting the mother in the face at a mall, purportedly while intoxicated, and had threatened to kill the mother and the child. Although appellant participated in services while in custody, every time he was released he failed to engage in services, resorted to addictive behavior, and perpetrated domestic violence. Appellant's therapist told Fonarev that appellant "was in no position to care for a child and be a father at this time."

Fonarev noted further that the child's last four visits with appellant had been a challenge for the child and had become increasingly more difficult. At the last visit, the child screamed from the moment she left her caregiver's arms; appellant was able to calm her down only to the point she was quietly sobbing, and he decided to end the visit due to her distress. During the prior visit, the child shut down and did not make any eye contact with appellant. After visits with appellant, she would remain "shut down" with her caregiver for a couple of days.

The court found that appellant was offered reasonable services but made no significant progress toward alleviating or mitigating the causes necessitating placement. The court terminated reunification services as to both parents and set a section 366.26 hearing. In addition, the court advised that "visits with the child will be based upon the child's needs which may result in a reduction of visitation."

On April 18, 2012, father attempted to file—one day late—a notice of his intent to file a writ petition. In June 2012, the writ proceeding was dismissed as untimely (*John C. v. Superior Court* (June 21, 2012, A135383) [order of dismissal]).

C. *Department's Section 388 Petition to Terminate Appellant's Visitation*

On May 15, 2012, the Department filed a section 388 petition to terminate visitation with appellant, based on the information contained in the Visitation Memo filed on April 2, 2012. The petition alleged that the child was experiencing emotional distress and "adverse reactions to visits with her father who is in custody," noting that the child "becomes 'shut down' or screams and cries for her foster parent."

Appellant filed an opposition to the petition, asserting that visitation should not be permanently terminated, but merely suspended for about a month until his release from jail in mid-June 2012. He acknowledged that visits with the child at either site of incarceration were traumatic for the child.

1. *Hearing*

A hearing on the section 388 petition began on July 3, 2012.

The court found social worker Patty Ramano to be qualified as an expert in the field of "determining detriment based on child visitation with a parent." Based on her review of reports in the case, Ramano testified that the visits with appellant had been very stressful and traumatic for the child, and the child was "basically in a stress mode" until she was reunited with her caregiver. Furthermore, although appellant had recently been released from custody, Ramano opined that it would be detrimental to continue visitation, because it would put her in a detrimental "stress response." In this stress response, the child clings to her caregiver, cries if forced to separate from her, and shuts down and disassociates in order to "survive the visit until she's back with her caregiver."

4

The main factor in the child's distress, Ramano opined, was being separated from her caregiver. Because the child had a history of attachment anxiety and had only recently formed a secure attachment with her caregiver, Ramano had a special concern about the child's well-being during visits with appellant, since she would be confused and not feel safe or secure. The child and appellant had no parent-child bond, and the child never responded to appellant in a way that exhibited a healthy attachment.

Ramano further opined that the child's stress response was not due to the location of the visits, but to the situation. In fact, Ramano personally observed the child experience a stress reaction during four visits with her other relatives at "C.P.S." The caregiver was not present for all of those visits, so the child's stress response did not depend on whether the caregiver was in the room. The child continued to have stress after the visits and would not sleep for about a week. Ramano added that the child has an unusually high level of anxiety around strangers—a level normally caused by prior trauma—and an abnormally high level of anxiety around appellant. Thus, although the locations of the visits had to be considered, the child's stress responses were primarily due to the nature of the relationship, and visits with appellant would be detrimental to the child even if they took place outside of the jail environment.

Appellant testified that he was released from jail on June 13, 2012. Because he had been incarcerated for most of the child's life, he was not able to be there for her, physically, emotionally or psychologically. He had four visits with the child at the main jail, and three or four visits at the North County facility. He agreed that the child appeared to be "shut down" and "zoned out" at the beginning of the visits. But he nonetheless asserted that she "always jumped in [his] arms every single visit." He further claimed that, as soon as she was handed to him, she would feel safe and secure and seek comfort from him.

2. *Order Granting 388 Petition and Terminating Visitation*

On July 10, 2012, the court issued a written order granting the Department's section 388 petition. After summarizing the evidence supporting its ruling, the court stated: "This case is post-reunification. Even without any finding of detriment, father's

visits would have been in a declining mode. While the Court applauds father for his sensitivity and concerns for the minor's welfare during his last visit, there is sufficient evidence from the file, the social worker's testimony, and father's testimony that visits with his daughter would, more likely than not, be detrimental to her."

This appeal followed.

## II. DISCUSSION

Appellant contends that the order terminating visitation pending the section 366.26 hearing was not supported by substantial evidence. We disagree.

To terminate visitation by a section 388 petition after reunification services have been terminated, the court must find, by a preponderance of the evidence, that continued visitation would be detrimental to the child. (*In re Manolito L.* (2001) 90 Cal.App.4th 753, 760; § 366.21, subd. (h).) We will review the court's factual finding of detriment for substantial evidence (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580-581) and the denial of the section 388 petition for an abuse of discretion (*Sheila S. v. Superior Court* (2000) 84 Cal.App.4th 872, 877-878, 880).

In the matter before us, substantial evidence supported the finding that visitation would be detrimental to the child. There is no dispute that visitation with appellant while he was incarcerated, either at the main jail facility or at the North County facility, was stressful, traumatic and detrimental. At the child's last such visit, for example, she screamed from the moment she left the caregiver's arms, and appellant was able to calm her only to the point that she sobbed quietly. Moreover, expert witness Ramano opined that visitation with appellant after his incarceration would also be detrimental, in light of the lack of a parent-child bond between appellant and the child, the child's prior attachment issues, the child's heightened stranger anxiety, and the fact that the child had only recently attained a secure attachment to her caregiver. Indeed, Ramano opined that the child's stress response was due primarily to the nature of the relationship between the child and appellant, rather than the location of the visits. There was no expert witness testimony to the contrary. From these facts, a reasonable inference may be drawn that the

6

child's visits with appellant between the time of the section 388 hearing and the section 366.26 hearing would be detrimental to the child.

Appellant argues that, although visitation during his incarceration may have been detrimental, evidence suggested that visitation after incarceration would not be. He contends that his visits with the child went well before his incarceration, and the stress the child experienced during the jailhouse visits was due to the commotion of the jail and other factors such as a "poopy diaper" and being stuck in an elevator. It is not our role, however, to reweigh the evidence. We review solely for substantial evidence of detriment and whether the termination of visitation was within the court's discretion. For the reasons stated *ante*, the court's order meets this test.

Appellant relies on *In re Dylan T.* (1998) 65 Cal.App.4th 765 (*Dylan T.*), in which the court ruled that the tender age of a child was inadequate, without any further showing, to constitute detriment sufficient for denying visitation with a parent while the parent was incarcerated. (*Id.* at pp. 767, 775-776.) But *Dylan T.* is distinguishable. In *Dylan T.*, visitation was denied in a disposition order that had provided for reunification services. (*Id.* at pp. 767-768; see §§ 362.1, subd. (a), 361.5, subd. (e)(1).) Here, by contrast, visitation was denied after reunification services had already been terminated. (§ 366.21, subd. (h); see *In re D.B.* (2013) 217 Cal.App.4th 1080, 1089-1090 [noting different policy concerns after termination of reunification services].) Moreover, visitation was denied in *Dylan T.* based on a bare allegation of the child's young age; visitation was denied in this case based on additional evidence concerning the child's emotional history, the nature of the parent-child relationship, and traumatic events during prior visits, as well as an expert witness opinion advising that continued visitation would be detrimental to the child.

Appellant further argues that precluding visitation between a child and a parent after the parent's release from jail, based on the child's stress response during visitation with the parent in jail, would effectively bar any incarcerated parent from visitation during and after incarceration. The argument is inapt. In this case, appellant's visitation was not terminated merely because the child was stressed while visiting him in jail, but

7

because that stress resulted primarily from the absence of a parent-child bond and the child's particularly fragile emotional condition, marked by attachment issues and stranger anxiety.

Appellant's reliance on *Christopher D. v. Superior Court* (2012) 210 Cal.App.4th 60 (*Christopher D.*) is also misplaced. There, the juvenile court had ordered weekly visitation with the father while he was in a residential treatment facility, but the social worker provided only two visits over approximately three months, claiming that she was too busy to travel the necessary distance to facilitate the required visitation. The court ruled that there was no substantial evidence to support a finding that the father had received reasonable visitation services. (*Id*. at pp. 73-74.) *Christopher D*. is thus distinguishable, since it addressed whether services provided by the agency were sufficient in light of the order requiring visitation, not whether visitation would be detrimental to the child. Nowhere does *Christopher D*. suggest that the facts in this case would be insufficient to establish detriment.

Appellant also refers us to *In re Hunter S.* (2006) 142 Cal.App.4th 1497. There, the juvenile court had failed to enforce its order for a mother's visitation with her child, because the child expressed opposition to the visits; the juvenile court subsequently denied the mother's section 388 petition to reinstate reunification services. (*Id*. at pp. 1501-1504.) The appellate court reversed: because the juvenile court essentially abdicated its discretion regarding visitation to the child and his therapist, it was an abuse of discretion to deny the mother her requested opportunity to have contact with her child (and thus preclude her from establishing the beneficial relationship exception under § 366.26, former subd. (c)(1)(A) [current subd. (c)(1)(B)(i)]). (*Id*. at pp. 1506-1508.) Appellant contends it is likewise unfair to deny him any real chance to satisfy the contact requirement of section 366.26, subdivision (c)(1), and to deny him the opportunity to repair his relationship with the child. We disagree. Unlike the juvenile court in *Hunter S.*, the court in this case did not improperly delegate its discretion regarding visitation to the child or to anyone else; to the contrary, it decided upon substantial

evidence that visitation would be detrimental to the child.  The statutory requirement for terminating visitation was therefore satisfied.

Appellant fails to establish error in the court's termination of his visitation.

### III.  DISPOSITION

The order is affirmed.

_____

NEEDHAM, J.

We concur.

_____

JONES, P. J.

_____

BRUINIERS, J.