Filed 7/25/24  In re G.I. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION TWO

|  |  |
|---|---|
| In re G.I. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E082867 |
| Plaintiff and Respondent, | (Super.Ct.No. J297911) |
| v. | OPINION |
| N.L., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Steven A. Mapes, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Tom Bunton, County Counsel and David Guardado, Deputy County Counsel, for Plaintiff and Respondent.

1

The juvenile court declared G.I. (born December 2006), D.L. (born March 2010), and S.L. (born October 2012) (collectively "the children"), dependents of the court; removed them from defendant and appellant N.L.'s (mother) custody; and granted her reunification services. The court ordered supervised visitation between mother and the children twice monthly for two hours. On appeal, mother contends the court abused its discretion by denying her request to have liberalized, unsupervised visitation with the children. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On July 20, 2023, personnel from plaintiff and respondent, the San Bernardino County Children and Family Services (the department) received an immediate response referral alleging "general neglect and caretaker absence/incapacity." Officers took mother into custody for child endangerment after an allegation that she was involved in a homicide. When officers arrived, mother said, "'I murdered my husband and dragged his body to the firepit and burned him.'" It was also alleged mother and the children were in the desert "living in a 'shant[y]' made of wooden pallets."[1]

An investigating officer found bone fragments in a firepit, but could not determine if they were animal or human. The officer reported the family resided in a home "made of wooden pallets and the floor is strictly dirt." There was no running water or septic in

---

[1] Mother had been living in the home with the children and her husband R.L., the father of D.L. and S.L. Mother had divorced D.I., G.I.'s father, years earlier. Neither father is a party to the appeal.

2

the home.  There was a small generator for power and minimal food in a broken refrigerator.

The children reported residing in the home for the previous one-and-a-half years. "They explained that their home is made of an RV with walls around it and a partial roof made of wooden pallets.  The children reported having their own rooms, beds, minimal furniture, and clean clothes.  They also stated they have no running water; however, they utilize water jugs."  "The children reported utilizing a solar generator for power that only works during the day.  They also stated they used to use a propane tank for gas, but since it has run out, they utilize an outdoor grill or firepit.  The children advised they have no food in the home at this time.  All children reported sometimes going to bed hungry because there is nothing to eat in the home."

D.L. stated mother had only $40 left for the rest of the month, and he did not know what they were going to do for food.  S.L. said that last time she showered was two months earlier; D.L. said he showered the previous month; G.I. said he last showered in March 2023.  None of the children had seen a dentist or doctor for years.

The children denied parents engaged in any physical abuse, domestic violence, or suffered from any mental illnesses.  However, S.L. said she wanted to get her father a therapist; D.L. stated mother said his father was "'sick in the head'" and "'paranoid.'" The children reported parents smoked marijuana daily.

G.I. reported his siblings' father left the home in April 2023, after an argument with mother.  The social worker made attempts to locate him, but was unsuccessful.

S.L. reported hearing gunshots when her father went missing. D.L. said he heard five gunshots; he later witnessed his father lying on the floor; the next day he saw drag marks from where his father's body was lying, which led to the firepit; mother then confessed to killing his father and burning his body in the pit. D.L. stated, "'I feel sad, I guess. I miss my dad.'"

The social worker spoke with G.I.'s father, who said the last time he visited G.I. was April 2023. The social worker assessed G.I.'s father's home, which was found to be clean and appropriately furnished; it had working utilities and adequate food.

On July 21, 2023, the social worker took the children into protective custody. On July 25, 2023, department personnel filed a Welfare and Institutions Code section 300 juvenile dependency petition as to G.I. alleging mother and G.I.'s father had failed to provide him adequate care and supervision (b-1 through b-4) and that mother left him without support when she was arrested (g-5).[2] The social worker recommended that G.I. be maintained in the custody of his father.[3]

At the detention hearing on July 26, 2023, the children's counsel requested the court deny visitation until the child assessment center (CAC) could conduct interviews and assessments regarding the purported homicide: "whether this is true or not true, that visitation with [mother] gives me very serious concerns about the topics being discussed and getting the information to the minors . . . in a harmful way." The juvenile court

---

[2] The record does not contain the juvenile dependency petitions filed with respect to S.L. and D.L.

[3] The record does not reflect when the department placed G.I. with his father.

detained minors and allowed G.I. to remain with his father. The court ordered no visitation between mother and any of the children until CAC assessments could be completed.

In an additional information to the court filed on July 26, 2023, the social worker reported that mother advised that she was currently on a psychiatric hold. She said father had abandoned them six months earlier. Mother reported they moved out to the desert to live "'off grid.'" She was "a stay-at-home mom for many years and was actively looking for a job and apartment as she did not want the children living in the cabin." When contacted by law enforcement she went "'HAM'" and could not recall everything she told them.

On August 15, 2023, the department personnel filed an amended juvenile dependency petition alleging mother had a history of engaging in domestic violence (b-5) and renumbering the previous g-5 allegation as g-6. In the jurisdictional and dispositional report pertaining to G.I., the social worker recommended the court find the b-2, b-3, b-4, and g-6 allegations not true, but find the b-1 and b-5 allegations true.[4] The social worker recommended G.I. be "maintained in the home of the father." She recommended the children be removed from mother's custody.

Mother disagreed that she had not provided the children with adequate care and supervision. She reported that she met all the children's needs. They had shade and

_____

[4] Because the record does not contain the juvenile dependency petitions for D.L. and S.L., it is difficult to understand the social worker's recommendations regarding them.

water in the July heat. Mother reported there was domestic violence, but not in front of the children. All the children reported that while there was arguing between parents, there was no physical fighting.

G.I. reported mother "is very kind and that he just loves her so much." He was concerned about her well-being. S.L. said mother "is caring, supportive, always wants the best for her, and that she makes sure they are safe. [S.L.] denied there was anything she did not like about the mother." She said she would want to live with both parents, but not at the home in the desert because it was "so hot all the time and [they] have no air conditioner." D.L. said mother was "a good mom." Department personnel placed S.L. and D.L. together in a foster home.

Mother said that prior to law enforcement's arrival on the day she was arrested, she could not get their truck started for three days. She reported "she had heat stroke and that it was the hottest week of July and there was no air conditioning." Mother became "'manic . . . so I spent two days, because I was sure I was going to die, making a monopoly game for the kids so we can play games together as I die.'" She called the police, but they said there was nothing they could do. So, mother made up the story about S.L. and D.L.'s father being dead because it was the only way she could obtain help: "The mother reported that her goal was to get the children out of the desert because they could not stay there, and she would not want them going back there."

Nevertheless, mother insisted the children had everything they needed. She reported that law enforcement had dropped all the charges against her, but "she was 5150

because she told everyone she was suicidal and that she had to go to hospital." She said D.L. knew that his father was alive.

An officer informed the social worker that the homicide allegation was unfounded. S.L. and D.L.'s father was in Mexico.[5] The People declined to file charges after mother's arrest for child endangerment.

Mother reported that D.L. and S.L.'s father left in April without saying where he was going. She said she was financially dependent upon him and, that when he left, she "was barely pushing through for food, and gas, and was down to having one meal a day which were crackers." Mother saved the protein for the children. She would not let them starve.

The social worker recommended G.I. be maintained in his father's home. G.I.'s father said "he would be comfortable supervising visits for the mother." G.I. reported that living with his father has been good; he liked sleeping in a bed and being able to make himself food. He said being with father was "awesome." G.I. said he liked living in a neighborhood, having his own room, and not having to have water delivered. G.I wished to live with father.

Mother said she smoked marijuana for 20 years, but quit at the end of June or July. The social worker noted that visitation had not yet occurred as the CAC interviews were not scheduled to occur until August 21, 2023. S.L. and D.L. both informed the social worker they would like visits with both mother and G.I.

---

[5] A later report reflected that homicide detectives had spoken to father, and he indicated he had left for Mexico and might not return.

7

The social worker recommended the juvenile court remove the children from mother's custody. As to G.I., the social worker recommended the court terminate dependency jurisdiction with family law custody orders.

At the hearing on August 16, 2023, mother's counsel asked for visitation, as she had not seen the children since the department took them into protective custody. The court authorized CAC assessments and ordered mother's visitation remain pending until the outcome of those assessments.

In the October 11, 2023, first addendum to the jurisdictional and dispositional report, the social worker recommended S.L. and D.L. be removed from mother's custody with mother to receive reunification services. As to G.I., the social worker recommended the court remove him from mother's custody, grant his father custody, and the dependency be dismissed. The social worker recommended visitation between mother, S.L., and D.L. be supervised once weekly for two hours.

On August 15, 2023, the social worker referred mother for parenting, domestic violence, and individual therapy. Mother texted back declining services. The social worker subsequently rereferred mother for services on October 3, 2023; mother had made intake appointments for all three services.

The children were seen for CAC interviews on September 6, 2023. On September 7, 2023, S.L. and D.L. had supervised phone visitation with mother. On October 2, 2023, all three children had supervised phone visitation with mother. The social worker

indicated in-person visits "have been difficult to schedule due to the mother not having transportation." Mother was attempting to find an apartment.

At the hearing on November 9, 2023, the department noted that G.I.'s father had settled with the department. Thus, the department requested the allegations against father be dismissed: "He is rendered nonoffending. The recommendation is to dismiss his case with the juvenile custody orders providing visits to the mother."

Mother's counsel objected: "I do believe the family-law orders outline joint legal custody, which Mother's fine with that, but she is asking that the Court order joint family maintenance as well. If the Court's not inclined to do that, she is asking for liberal visitation with her children unsupervised in a neutral setting." The children's counsel submitted on the department's recommendations.

The court sustained the allegations with respect to S.L. and D.L. It sustained the b-1 allegation pertaining to G.I. and dismissed or struck the remaining allegations. The court removed G.I. from mother's custody and dismissed the case with family law orders over mother's objection. The court removed S.L. and D.L. from mother's custody and granted her reunification services. It ordered mother have supervised visitation with the children twice monthly for two hours.

## II.    DISCUSSION

Mother contends the court abused its discretion in denying her liberalized, unsupervised visitation with the children. The department maintains we should disregard mother's challenge to the visitation order as to S.L. and D.L. because mother failed to

appeal the order as to them.  Regardless, the department asserts the court acted within its discretion in denying unsupervised visitation.  We agree with the department.

A.    Jurisdiction

The department contends we should disregard mother's claims with respect to S.L. and D.L. because she failed to appeal the visitation order with respect to them.  We agree.

"'[T]he timely filing of an appropriate notice of appeal or its legal equivalent is an absolute prerequisite to the exercise of appellate jurisdiction.  [Citations]' '[O]nce the deadline [to appeal] expires, the appellate court has no power to entertain the appeal.'" (*In re J.F.* (2019) 39 Cal.App.5th 70, 74-75.)  "A notice of appeal 'is sufficient if it identifies the particular judgment or order being appealed.'  [Citation.]  "'Our jurisdiction on appeal is limited in scope to the notice of appeal and the judgment or order appealed from."  [Citation.]  We have no jurisdiction over an order not mentioned in the notice of appeal.'  [Citation.]"  (*Id*. at p. 75.)

"Generally, we must liberally construe a notice of appeal in favor of its sufficiency.  [Citation.]  A notice of appeal shall be "'liberally construed so as to protect the right of appeal if it is *reasonably clear* what [the] appellant was trying to appeal from, and where the respondent could not possibly have been misled or prejudiced."'  [Citations.]"  (*In re J.F*., *supra*, 39 Cal.App.5th at pp. 75-76.)

"But there are limits to our ability to liberally construe a notice of appeal.  'The policy of liberally construing a notice of appeal in favor of its sufficiency [citation] does not apply if the notice is so specific it cannot be read as reaching a judgment or order not

mentioned at all.' [Citations.]" (*In re J.F.*, *supra*, 39 Cal.App.5th at p. 76.) "Therefore, when a notice of appeal manifests a '"clear and unmistakable"' intent to appeal only from one order, we cannot liberally construe the notice to apply to a different, omitted order. [Citations.]" (*Ibid.* [court lacked jurisdiction to consider parent's arguments on appeal as to order from which parent did not appeal].)

Here, mother's notice of appeal specifies that it is from the juvenile court's order of November 9, 2023, *as to G.I. in case No. J297911*. No mention of the other two minors or their case numbers is reflected in the notice of appeal. Mother's notice of appeal is so specific that we cannot read it as reaching the orders as to D.L. and S.L. in different juvenile court cases. Thus, we have no jurisdiction to reach her claims with respect to them.[6]

B. Liberalized, Unsupervised Visitation

Mother contends the juvenile court abused its discretion in declining to give her liberalized, unsupervised visitation with G.I. We disagree.

---

**6** Moreover, as noted in footnotes 2 and 4 *ante*, the record on appeal does not contain the juvenile dependency petitions or minute orders with respect to S.L. and D.L. An appellant "'has the burden of providing an adequate record. [Citation.] Failure to provide an adequate record on an issue requires that the issue be resolved against [appellant].'" (*In re Marriage of Oliverez* (2019) 33 Cal.App.5th 298, 312; see *In re N.G.* (2018) 27 Cal.App.5th 474, 483 ["[A]s a general rule, it is the appellant's burden to produce an adequate record that demonstrates prejudicial, reversible error on appeal"].)
Mother's request for judicial notice of postjudgment evidence of the court's order giving her unsupervised visitation with S.L. and D.L. is denied, because as discussed *ante*, we have no appellate jurisdiction over mother's claims with respect to them.

"Where a child is removed from a parent's custody in a dependency proceeding and reunification services are ordered, the general rule, stated in California Rules of Court, rule 5.695(h)(5), is that 'the court must order visitation between the child and the parent or guardian for whom services are ordered. Visits are to be as frequent as possible, consistent with the well-being of the child.'" (*Christopher D. v. Superior Court* (2012) 210 Cal.App.4th 60, 69.)

"'We review . . . visitation orders for an abuse of discretion, and apply the substantial evidence standard to the [juvenile] court's factual findings. [Citation.] A court abuses its discretion in making a[n] . . . order if there is no reasonable basis on which it could conclude that its decision advanced the best interests of the child. [Citation.]'" (*Noble v. Superior Court* (2021) 71 Cal.App.5th 567, 578; accord, *S.Y. v. Superior Court* (2018) 29 Cal.App.5th 324, 333-334.)

Here, although the court did not make express findings in declining to award mother liberalized, unsupervised visitation, there was substantial evidence from which the court could have determined that mother was psychologically unstable. Therefore, at least in the beginning, the court could reasonably conclude that in-person visitation should be limited and supervised.

Mother convinced S.L. and D.L. that she had murdered their father. She confessed as much to the police when they arrived. S.L. reported hearing gunshots when her father went missing. D.L. said he heard five gunshots; that he later witnessed his father lying on the floor; the next day he saw drag marks from where his father's body was lying,

which led to the firepit; mother then confessed to killing his father and burning his body in the pit. D.L. stated, "'I feel sad, I guess. I miss my dad.'" However, it was later discovered that their father had simply left the home.

Mother herself indicated she had gone "'HAM'" and "'manic.'" She believed that she was going to die and apparently created a board game so the children could play with her as she died out in a remote location in the desert. After the authorities dropped charges against mother, she was placed on a psychiatric hold for being suicidal. Thus, there was ample evidence from which the court could have reasonably concluded that mother was psychologically unstable. Therefore, the court acted within its discretion in ordering mother initially have limited, supervised visitation with G.I.

## III. DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

MILLER
J.

MENETREZ
J.

13